OTTO HOEFS ET AL. v. J. C. SHORT.

No. 3068.   Decided May 13, 1925.

(273 S. W. 785).

1.—Judicial Knowledge.

Courts take judicial notice, as a matter of common knowledge, of the natural features of the State, including the general location of its mountains and the courses of its rivers.   (P. 504).

2.—Irrigation—Surface Waters.

Waters not diffused over the surface of the ground, but accustomed to flow in a well defined channel, in a stream which, though intermittent as to flow, has a defined and permanent existence, are not mere surface waters, but the waters of a stream to which rights as riparian owners may attach.   (P. 505).

3.—Same—Water Course—Use for Irrigation.

When the channel of a water course is of such substantial, stable, and permanent character that its existence is easily recognized, and rain falls on its watershed with fair regularity and sufficient volume to produce a flow of water in such channel which, while not regular, is valuable for irrigation purposes, this satisfies every legal requirement as to permanency of source of water supply and shows that the waters of such stream are not mere surface waters.   (Pp. 505, 506).

4.—Same.

.  The test of the permanency of the source of water supply in a stream which will render it one to which rights to its use for irrigation may attach, is whether its waters are so confined and persistent in their course and flow with such frequency and volume as to render it both practicable and valuable to irrigate therefrom, though the flow be not continuous and the stream may be dry for long periods of time.   (Pp. 506-510).

5.—Same—Evidence.

The evidence here considered is held sufficient to support the judgment finding plaintiff entitled, by prior appropriation under the laws of the State, to irrigation rights in the waters of Barilla Creek, in Reeves County, and authorize an injunction against such appropriation and diversion of its waters by a riparian owner higher up the stream as would prevent his own use of them for irrigation.   (P. 510).

6.—Riparian Owner.

Where a stream had long flowed through the land of an owner, his rights to the use of its waters were not affected by the fact that it did not so flow when title to the land was first acquired by patents from the state.   His rights depended on the present status, not on the length it had existed.   (P. 510).

Error to the Court of Civil Appeals for the Eighth District, in an appeal from Reeves County.

Short sued Heefs and others and obtained an injunction. The defendants appealed, and on affirmance (190 S. W., 802) obtained writ of error.

*Clay Cooke*, for plaintiffs in error.

It appearing that the lands of defendants across which said rain-waters flow passed from the State of Texas in 1874, long prior to any attempted reservation of said waters, the right to said rain waters was vested in defendants absolutely, and said act has no application thereto, nor could same be appropriated in the manner sought, it being incumbent on plaintiff to show that the title to said depression and the watershed thereof was in the State of Texas at the time of the passage of said act. Art. 4991, R. S., 1913; Barnett v. Matagorda Rice Co., 98 Texas, 355, 83 S. W., 801; McGhee Irr. Co. v. Hudson, 85 Texas, 587; Batla v. Goodell, 115 S. W., 622: Sec. 10, Art. 1, U. S. Const., Sec. 17, Art 1, Const. of Texas: Kinney on Irr., Vol. 2, Sec. 654; 8 Cyc., p. 930; Barrett v. Metcalf, 33 S. W., 759; Cave v. Tyler, 133 Calif., 566; Mud Creek Irrig. Co. v. Vivian, 74 Texas, 173.

The common law rule with respect to surface water obtains in this State. Barnett v. Matagorda Rice & Irr. Co., 98 Texas, 355. That rule is that the landowner can receive and impound same on his own land, or can repel same from his land, without liability to anyone. The reason for this rule is given by Justice Brewer, when Judge of the Supreme Court of Kansas, in Gibbs v. Williams, 37 Am. Rep., 243, and quoted with approval by the Supreme Court of Texas in the case above cited.

*Ross & Hubbard*, for defendant in error.

Art. 4991, R. S., by its terms, declares that the unappropriated waters........of the storm-, flood- or rain-waters of every river or natural stream canyon, ravine, depression or watershed, within the state, the title to which has not already passed from the state, are the property of the state, and the right to the use thereof for irrigation purposes may be acquired by appropriation as therein provided; and it appearing that appellee has appropriated, in manner and form and for the purposes provided by law, a certain portion of such unappropriated waters and is applying same to a beneficial use, he is entitled to a decree protecting him in the enjoyment thereof and enjoining the illegal diversion of all the waters of the source of his appropriation away from the land to which he is

applying same.  Art. 4991, R. S., 1913; Art. 5001 a., R. S., 1913;
Hoefs v. Short, 178 S. W., 11; Cyc., Vol. 40, p. 738.

The proof showing conclusively that Barilla Creek is a natural
water-course, from time immemorial, has drained the rain, flood and
storm-waters of an area of hundreds of square miles, and that said
creek, although dry at times, carries water as often as twenty or
more times per year and with sufficient regularity to make same
useful and valuable for the irrigation of land and the growing of
crops, and appropriation of the unappropriated waters thereof, made
in manner and form and for the purposes prescribed by statute, vests
in the appropriator a property right which a court of equity will
protect by prohibiting the placing of such obstructions in the channel
of the creek by an upper landowner as will result in diverting there-
from, to the irreparable injury of the appropriator, water to which
such upper landowner has no title but which must pass in such
channels across his premises before reaching the appropriator's point
of diversion upon his own land.  Art. 4991, R. S. 1913; Kinney
on Irrigation and Water Rights, Vol. 1, p. 501; Wiel on Water
Rights, 2nd Ed., pp. 165 and 163; Farnham on Waters, Vol. 2, p.
1559, 2556-2558; Cyc., Vol. 40, p. 639; Jaguez Ditch Co. v. Garcia,
124 Pac., 891; Borman v. Blackmon, 118 Pac. 848.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

The locus of this controversy is in Reeves County, in the arid
or semi-arid region, where irrigation is necessary for agricultural
purposes.  The parties will be designated as in the District Court.
Suit was brought by J. C. Short against Otto Hoefs and three others
of the same name, for the purpose of enjoining them from con-
stucting a dam in Barilla Creek and diversion ditches therefrom,
in such manner as to prevent the residue of the water in excess
of 100 second feet from passing down the channel of the creek to
the dam and ditches of the plaintiff, located below and north of
those of the defendants.  The injunction was granted by the trial
court, and the judgment affirmed by the Court of Civil Appeals.
The case is reported in 190 S. W., 802, and it is unnecessary for
us to make a complete statement of the case.

The effect of the proposed constructions of the defendants would
have been to take all of the water out of Barilla Creek and convey
it to their own lands, and to prevent Short from receiving any of
the water of the stream.  The primary and fundamental question is
whether or not Barilla Creek is a stream to which irrigable rights
attach.

The plaintiff's section of land No. 58, Block 13, H. & G. N. R. R.
Co. Survey, is crossed by Barilla creek.  This stream is fed by the

rainfall collected within its watershed, an area of approximately 350 square miles, or about 225,000 acres, in the foothills and mountains lying south of his land. The creek runs only after rainfall, but when it runs it flows in a well defined channel, with well defined banks and bed, from a point south of the plaintiff's lands to a point extending below and north of his lands some distance. This well defined channel, banks and bed extend up the stream from below plaintiff's lands as far as the witnesses have gone, about 70 miles. The channel is from three to fifteen feet deep, from forty to one hundred feet wide, and if full would carry as much as 4000 second feet of water. It contains boulders and gravel, and but little, if any, vegetation. One witness said for fifty years it had not had enough dirt to grow grass. The stream flows when it rains, from one to twenty-two times each year, at more or less regular seasons. After rainfall it runs from "a day or two" to "a good while", and the water sometimes stands in holes for as long as two weeks. According to the testimony, Lympia Canyon run into Barilla Creek, and we infer that the creek is in reality an extension of the canyon where the latter passes out into the valley or plain. The creek sometimes has water in it when there has been no rainfall in the immediate vicinity. This water comes from Lympia Canyon.

The evidence shows that the water comes down Barilla Creek in such volume that the whole neighborhood would have plenty of water if it was divided according to the land which each man has.

The evidence is uncontradicted that the water comes down Barilla Creek with sufficient regularity, one year after another, to make it valuable and useful and beneficial for agricultural purposes. One of the witnesses states that while it does not come down on the same days each year, it comes somewhere about the same time; that the water comes when it rains; that rains generally fall, and that there are certain months when it is more likely to rain than other months. One of the witnesses testified that the water frequently comes down the Barilla when there has been no rain in that immediate vicinity, from rainfall in the mountains fifty or sixty miles above. The testimony shows that two average good overflows with what rains that fall will made good crops in the Barilla country.

We judicially know, as a matter of common knowledge, the natural features of the State, including the general location of its mountains and the courses of its rivers. Chamberlayne's Handbook on Evidence, §§ 355, 352; G. C. & S. F. Ry. Co. v. State, 72 Texas, 404, 409; Giddings v. Day, 84 Texas, 605, 608; The Montello, 11 Wallace (U. S.), 411, 416; Green County v. Clay County, 205 S. W.. 709, 710. We therefore know that Lympia Canyon is located in the Trans-Pecos Mountains, which are a part of the Rocky Mountain

system.  It rises in the Davis Mountains, southwest of Fort Davis, cuts entirely across these mountains, and flows in a northeasterly direction until it enters the syncline or trough separating the Davis and Barilla Mountains.  The size and importance of the canyon as a physiographic feature is beyond question.  It is a part of one of the substantial drainage systems of the mountains of that area.

It is true that the age and size of the canyon and the fixed course of the stream within its canyon or valley walls does not establish a channel for Barilla Creek at any particular locality after the canyon passes into the plain, but it does show beyond controversy that Barilla Creek is a part of a stream and drainage system literally "as old as the hills", with source of water supply as fixed and permanent as the rainfall on the watershed of Lympia Canyon.

The major contention of the defendants is that the waters of Barilla Creek are mere surface waters, to which water rights do not attach.

It is obvious from the evidence that this defense is untenable. The waters of Barilla Creek are not diffused over the surface of the ground, but are accustomed to flow in a well defined channel, in a stream, which, though intermittent as to flow, has a well defined and permanent existence.  They are therefore not surface waters, but are the waters of a stream.  Ruling Case Law, Vol. 27, p. 1137; Farnham on Waters, Vol. 3, § 878; Kinney on Irrigation, Vol. 1, § 318.  We are of the opinion also that Barilla Creek is a stream of such character that water rights attach to it.

The evidence shows without controversy that Barilla Creek has a substantial existence, with a well defined channel, with banks and bed, and in times of rainfall flowing water.  The location of the channel and banks is not ephemeral in character.  They were there in some form, more or less defined, in their present location, in every part of the stream, as far back as the earliest recollection of of the witnesses.  Certainly some parts of the present channel are very old, for no witness refers to any abandoned channels in the valley.  Besides, the evidence, though brief, shows considerable age for certain sections of the channel.  Its denuded condition, absence of soil and vegetation, and presence of boulders and gravel, show without question the long persistence of a current where the channel is now located.  In addition to this, the witness Randolph testifies to a feature which evidences both age and stability for the channel. In part he says:  "It is a fact that along the draw below the "U" dam and above Hoefs' dam the banks of Barrilla Draw immediately beyond where the draw is washed out are higher than the land further away; there is a depression on each side of the draw.  The draw is on what you would call a ridge.  The banks are higher than

either side.'' This evidence clearly shows that the stream in the section described has the familiar natural levees made by deposition in flood time. Tarr's College Physiography (1st Ed.), p. 146; Cleland's Geology, p. 123; Chamberlain and Salisbury's Geology, Vol. 1, p. 188. This process is necessarily a slow one, and requires both stability and time for its accomplishment.

It is plain, we think, that the channel of Barilla Creek is of such substantial, stable, and permanent character that its existence is easily recognized, and that rainfall on its watershed in sufficient quantities will produce a flow of water in this channel. The evidence without dispute shows that rain falls on this watershed at certain seasons with a fair degree of regularity, and it is admitted ''that the waters which from time to time flow down Barilla Draw are sufficient in volume, while not regular, to be valuable for irrigation purposes.'' This satisfies every legal requirement as to permanency of source of water supply, and shows the waters of Barilla Creek are not mere surface waters.

When it is said that a stream in order to be a natural water course to which water rights attach must have bed, banks, a current of water, and a permanent source of water supply, we have only described in detail such physiographic and meteorological characteristics as make the use of the stream for irrigation practicable. When it is once shown that the waters of a stream are so confined and persistent in their course, and flow with such frequency and volume that it is both practicable and valuable to irrigate therefrom, it is a stream to which such water rights attach.

With reference to the phrase 'definite and permanent source of supply of water'', frequently used by the courts as describing a necessary requisite of an irrigable stream, all that is meant is that there must be sufficient water carried by the stream at such intervals as may make it practicable to irrigate from or use the stream.

Rain falls on the watershed of Barilla Creek from one to twenty-two times each year, in sufficient volume to permit irrigation from the stream. This is a permanent source of supply. The watershed is permanent, the meteorological laws which cause the rain to fall there are permanent, and the stream bed, by which the waters reach the locality in controversy, is to all intents and purposes permanent. But more convincing still than these is the admitted fact that the rain does fall and run down Barilla Creek in sufficient quantity, and with such regularity and frequency, as to be valuable for irrigation; and people have been for years, and are now, successfully irrigating from it. The facts as to bed, banks, and permanency of source of water supply are mere evidentiary facts that a stream can be used for irrigation or water right purposes. When the

fact of utility is conceded, or established, as it is here, the stream is one to which water rights attach, regardless of variations from the ideal stream of physiographers and meteorologists. We think these conclusions arise, not only upon an application of common sense and reason to the question, but are supported by authority as well.

Various authorities have held that in order for there to be a natural water course, there must be a channel, consisting of well defined bed and banks, a current of water, and a permanent source of supply. Kinney on Irrigation, Vol. 1, §§ 303, 305, 306, 307, 312, 315, 317; Ruling Case Law, Vol. 27, pp. 1062, 1063, 1064, 1065, 1066, 1067; Rait v. Furrow, 10 Am. & Eng. Anno. Cases, p. 1044; Jaguez Ditch Co. v. Garcia, 124 Pac., 891; McComber v. Godfrey, 11 Am. Rep., 349; West v. Taylor, 13 Pac., 665; McClure v. Red Wing, 9 N. W., 767; Mo. Pac. Ry. Co. v. Wren, 62 Pac., 7; Simmons v. Winters, 28 Am. St. Rep., pp. 727, 730; Mace v. Mace, 67 Pac., 660.

These authorities and others which follow show that while the rule as ordinarily expressed it that a water course must have a well defined channel, bed, and banks, yet there may be instances where these are slight, imperceptible, or absent, and still a water course exist.

All authorities agree that a current of water is necessary, yet the flow of water need not be continuous, and the stream may be dry for long periods of time. Authorities supra; Kinney on Irrigation, Vol. 1, § 307; Angell on Watercourses (6th Ed.), § b; Ruling Case Law, Vol. 27, pp. 1063, 1066, 1067.

Mr. Kinney in the text cited, (Section 307), says:

"Those who are acquainted with the streams and water courses of the arid Rocky Mountain region of this country, draining as they do to steep, mountainous areas with their swift currents. running over gravelly and rocky bottoms, know that often in the dry summer months many of them are entirely dry, at least upon the surface. All of them, nevertheless, have well defined beds, channels, banks, and currents of water, at least the greater portion of the year, and are in every respect water courses to which water rights may attach. But it would be plainly impracticable in this western part of the country to require that, in order to constitute a water course upon which rights may attach, there must be a continuous. uninterrupted, and perennial flow of water during the entire year, and from year to year. Hence the requirement of the law is that in order to constitute a water course the stream need - not flow all of the time."

The general rule is that ravines, swales, sloughs, swamps, and marshes are not water courses, and yet they are sometimes.

Again, it is sometimes said that in order to constitute a water course, there must be something more than mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. The authorities say that this is true in its strict sense, but that surface water may collect from such a large drainage area and be so continuous in its flow as to constitute a water course. Kinney on Irrigation, Vol. 1, §§ 306, 312, 314, 315, 317; Ruling Case Law, Vol. 27, p. 1063.

Mr. Kinney in Section 312 says:

"The distinguishing feature between a ravine and a water course is the permanent water supply. If there is not a permanent water supply, at least at frequent intervals, it is but a ravine; but if there is, it is a water course. As was said in an Oregon case: 'Where water, owing to the hilly or mountainous configuration of the country, accumulates in large quantities from rain and melting snow, and at regular seasons descends through long, deep gullies or ravines upon the lands below, and in its onward flow carves a distinct and well-defined channel, which even to the casual glance bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial, such a stream is to be considered a water course, and to be governed by the same rules.' "

The authorities frequently say that a natural watercourse must have a permanent source of water supply. This however merely means that the stream must be such that similar conditions will produce a flow of water, and that these conditions recur with some degree of regularity, so that they establish and maintain a running stream for considerable periods of time. Farnham on Waters, Vol. 2, § 457; Ruling Case Law, Vol. 27, pp. 1065, 1066; Kinney on Irrigation, Vol. 1, § 306.

Mr. Farnham in his work on Waters and Water Rights, Vol. 2, § 457, says:

"The source of the water which flows in a channel claimed to be a water course is a much more satisfactory test than is the presence or absence of channel. It has been said that to constitute a water course there must be something more than surface water. This, however, is not strictly true, for the surface water may collect from so large an area of country and be so continuous in its flow that it takes upon itself the character of a water course. But to constitute a water course there must be a supply which is permanent in the sense that similar conditions will always produce a flow of water, and that the conditions recur with some degree of regularity, so that they establish and maintain for considerable periods of time a running stream. * * * The stream need not flow continuously

in order to constitute a water course. As said in Parke County v. Wagner, a water course is a living, permanent, or continuous stream of water, confined in a channel having a bed and banks, but not necessarily flowing all the time, or even a greater portion of the year, if in fact it has a supply of living water, although that supply need not be sufficient at all times or most of the time to flow the entire length of the channel, and need not necessarily .empty into some other stream or body of water, but may sink into cavities or be absorbed by rapid percolation into a bed of gravel or soil.''

The meaning of the phrase in the definition quoted to the effect that the source of water supply must be sufficient to ''establish and maintain for considerable periods of time a running stream'' must be understood in the light of Mr. Farnham's previous statement (Sec. 455, p. 1557), to the effect that:

''A water course must be a stream of such a character as to give persons owning land upon it the right to have it maintained for the benefits which flow to them from the advantages of a natural flowing stream,'' ＊ ＊ ＊

After having reviewed at some length the contrariety of definitions made by the courts in discussing the subject of what is a natural stream to which irrigable rights attach, Mr. Farnham arrived at a conclusion substantially in accord with that which has been previously expressed by us. In Vol. 2, § 459, he says:

''Having thus determined what are the material and what the immaterial characteristics of a water course, we are in a position to arrive at a definition which will be more serviceable than some which have been adopted. A water course must have the characteristics of a flowing stream. It must have source, outlet, and channel, but all of these are more or less uncertain and undefined. *The distinguishing characteristic is the existence of a stream of water flowing for such a length of time that its existence will furnish the advantages usually attendant upon streams of water.* The courts have attempted to describe this condition as a stream usually flowing in a definite channel, having bed and sides or banks, and usually discharging itself into some other stream or body of water.'' (Italics ours).

Mr. Farnham quotes with approval the opinion of the court in the case of Arthur v. Grand Trunk R. Co., 22 Ontario Appellate Reports, 89, as follows:

''A water course must always have some point of commencement. and it may not be quite easy in every case to say just precisely where that point is. If a stream is traced up towards its source, a point will always be reached where it ceases to be definable by a bed and banks; but until that point is reached it must be a water course.

whether its origin be a spring or several springs, or the rain or snowfall of a district collected naturally and flowing away for the first time in a visible course or channel. All our lakes, rivers, and streams have their source in the clouds of the sky, precipitated in the form of rain or snow; and *the sole question in every case is whether the water thus precipitated has formed for itself a visible course or channel, and is of sufficient magnitude or volume to be serviceable to the persons through or along whose lands it flows.* It is immaterial that it may be intermittent in its flow, or that at certain seasons of the year there may be little or even no flow of water.'' (Italics ours).

The author of the note to the case of Harrington v. Demaris, 1 L. R. A., (N. S.), 726, states that the definition of a water course given by Mr. Farnham, to the effect that its distinguishing characteristics is the existence of a stream of water flowing for such length of time that it furnishes the advantages usually attendant upon stream of water, is the logical conclusion, which has been adopted by a majority of the cases.

We therefore hold that Barilla Creek under the undisputed evidence and admitted facts meets all the requirements of a natural water course to which water rights, whether riparian or by appropriation, attach.

It is unnecessary for us to discuss the validity of the water appropriation acts, or the conflict, if any, between these laws and the law of riparian rights. The plaintiff had complied with the appropriation acts, and, in addition, his land was clearly riparian. In either case he was entitled to equitable relief. He predicated his cause of action upon the appropriation acts, but his pleading does not show that his land is crossed by the stream, and he prayed for an injunction and for general relief. No contention is made that plaintiff was not equitably entitled to the amount of water claimed by him, if Barilla Creek is an irrigable stream. We have therefore concluded that since at all events the injunction properly issued, it is unnecessary to discuss the merits, or conflicts, if any, of the two water-right systems in this case.

There is no merit in the contention that Barilla Creek did not cross plaintiff's land in 1874, when the patents were issued to defendants' land, and that therefore plaintiff has no right to the waters of the stream. The evidence shows beyond question that the stream crosses plaintiff's land now, and has been flowing across it in a well defined channel for many years. The record likewise shows that when first seen by the witnesses, as early as 1884 or 1885, there was a channel, though not so well defined as at the present, across it. There is therefore no basis of fact for the defendants' legal contention as to effect of the absence of the stream on plaintiff's land in 1874.

Besides, it is not necessary for water rights to attach that the stream way should have been across his land any particular length of time, if the stream now has a substantial existence, and is of value as an irrigable stream. Rait v. Furrow, 10 Anno. Cas., 1044, 1046; see also Kinney on Irrigation, Vol. 1, § 539; Farnham on Waters, Vol. 2, § 491; Wholey v. Caldwell, 30 L. R. A., 820.

The judgments of the District Court and Court of Civil Appeals are affirmed.

*Affirmed.*