Kevin **DIETRICH,** Denise Dietrich, and Seth Dietrich, a minor child, Appellants,

v.

Harold C. **GOODMAN,** Jr. and Winford J. Goodman, Appellees.

No. 14–01–01168–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 24, 2003.

Rehearing Overruled Dec. 11, 2003.

Timothy John Clyne, Houston, for appellants.

James F. Tyson, Houston, for appellees.

Panel consists of Chief Justice BRISTER, Justice JAY HARVEY HUDSON, and Senior Chief Justice MURPHY.*

## MAJORITY OPINION

J. HARVEY HUDSON, Justice.

Kevin Dietrich, Denise Dietrich, and Seth Dietrich, a minor child, ("Dietrichs") appeal from the trial court's (1) directed verdict in favor of Harold C. Goodman Jr. and Winford J. Goodman, ("Goodmans"); and (2) denial of their motion for new trial. We affirm.

Memorial Northwest, a suburban subdivision in northwest Harris County, was developed during the mid–1990s. Part of the development included a country club recreational area containing wooded acreage, tennis courts, and other amenities. Because the recreational area was located on property having a higher elevation than some of the residential lots, a storm sewer was constructed at the rear of one of the residential lots where it was intended to intercept surface water flowing from the recreational area toward the lower residential area during times of heavy rainfall.

When viewed from above, the storm sewer had a flat concrete top, approximately four feet square, with an iron manhole cover in the center. The drain, which was not visible from above, was located vertically on one side of the concrete structure. The drain opening faced the country club and extended to a depth of approximately two feet. The storm sewer was located on the right, rear corner of a residential lot and strategically placed at the base of a natural gully which drained approximately four acres of wooded recreational property when it rained. So long

* Senior Chief Justice Paul C. Murphy sitting by assignment.

as the drain opening was free of debris, it was capable of capturing and diverting over 1,000 gallons of water per minute.

In December of 1997, the Goodmans moved into the home constructed on the lot containing the storm sewer. The Goodmans testified the house was under construction, and about ninety percent complete when they first saw it. Not surprisingly, the back yard contained mounds of dirt and construction debris. They noticed a concrete pad in their yard located about 12 to 18 inches from a privacy fence marking the rear boundary of their property. Although Mr. Goodman recognized the man hole cover as a means of access into a storm sewer, he testified he had no idea the drain opening was on his property. Since all four sides of the structure were covered with dirt, Goodman assumed the drain was located behind his fence on the recreational property.

Mr. Goodman's testimony was disputed by George Goettee, the developer/builder. Goettee claimed that when he walked the property with Goodman, the drain was uncovered and clearly visible. In fact, Goettee claims he stepped down into the two foot deep channel leading to the drain while in Goodman's presence, and told him he would need to keep the drain clear. Goodman, on the other hand, testified that (1) there was no channel leading into the storm sewer because it had been filled with dirt; (2) the drain was not visible; (3) the drain was so close to the rear fence, Goettee could not have stepped down into the channel even if it had been clear of dirt and debris; and (4) Goettee offered to landscape the yard in such a way as to hide or cover the top of the storm sewer.

Thereafter, Goodman noticed standing water both in and behind his backyard. Assuming the drain was clogged, and further assuming the drain was located on the recreational property, Goodman called the country club and requested that the drain be cleared. When the problem was not rectified, Goodman claims he called the country club on at least four other occasions.

In August of 1998, the Dietrichs purchased a house adjacent to the Goodmans' home. Two months later, during a torrential thunderstorm, the Dietrichs awakened to find several inches of water on the first floor of their home. Mr. Dietrich, fearing that his neighbor might also be in danger of flooding, awakened the Goodmans in the early morning hours to alert them to the danger. The Goodman family immediately began digging two ditches to drain water out of their backyard and divert it along both sides of their house. The Dietrichs and the Goodmans also opened fence gates to facilitate the flow of water to the street in front of their respective homes.

The Dietrich home was heavily damaged by the flood water. In a subsequent investigation into the cause of the flooding, an engineer located the drain and discovered that it was occluded by dirt, roots, and several bricks. The engineer, later assisted by the Goodmans, cleared the drain. Eventually, the storm sewer was relocated and moved onto country club property.

Asserting claims of negligence, violations of the Texas Water Code § 11.086, and trespass, the Dietrichs filed suit against the Goodmans. The Dietrichs also sought exemplary damages alleging malice. The trial court granted the Goodmans' directed verdict on all claims other than simple negligence. A jury subsequently found the Goodmans were not negligent. Thereafter, the Dietrichs filed a motion for new trial based on their claims of statutory liability and malice. The motion was denied, and the Dietrichs have pursued this appeal.

## Standard of Review

In reviewing the trial court's granting of a directed verdict, we must determine whether there is any evidence of probative force to raise a fact issue on the material questions presented. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). We consider all of the evidence in the light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences; we give the losing party the benefit of all reasonable inferences created by the evidence. *Id.* If there is any conflicting evidence of probative value, a directed verdict is improper and the case must be reversed and remanded for jury determination of that issue. *Id.*

## Surface Water

Section 11.086(a) of the Texas Water Code prohibits a person from diverting or impounding the natural flow of "surface water" in a manner that damages the property of another by the overflow of the water diverted or impounded. TEX. WATER CODE ANN. § 11.086(a) (Vernon 2000). Damages are allowed under the statute when "(1) a diversion or impoundment of *surface water* (2) causes (3) damage to the property of the plaintiff landowner." *See Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 611 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (emphasis added); *see also Kraft v. Langford*, 565 S.W.2d 223, 229 (Tex.1978) (addressing an earlier version of the statute).

Although Kevin Dietrich testified he had no reason to believe the Goodmans knew of the drain on their property until after the flood, the Dietrichs nevertheless contend they were damaged by the Goodmans' actions in landscaping around and over the storm sewer. Specifically, the Dietrichs contend they were flooded when the Goodmans diverted "surface water" onto their property in violation of the Water Code. Thus, the Dietrichs allege the trial court erred in granting the Goodmans' motion for a directed verdict on the issue of statutory liability under Texas Water Code § 11.086(a). The Goodmans, however, argue that the Dietrichs' Water Code claim fails, as a matter of law, because the water that flooded the Dietrichs' home was not "surface water."

"Surface water" is not defined by the Water Code. Compounding this legislative oversight is the fact that the term has been used in different contexts. In common usage, the term simply means "natural water that has not penetrated much below the surface of the ground." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2300 (1993).

However, when used in connection with riparian rights, "surface water" is a term of art. Under common law, diffused surface water, as well as percolating ground water, belongs to the land owner. *See Dyegard Land Partnership v. Hoover*, 39 S.W.3d 300, 311 (Tex.App.-Fort Worth 2001, no pet.) (holding owner of land is absolute owner of percolating water because it is part of the soil); *Domel v. City of Georgetown*, 6 S.W.3d 349, 353 (Tex. App.-Austin 1999, pet. denied) (holding diffused surface water belongs to the owner of the land on which it gathers, so long as it remains on that land and prior to its passage into a natural watercourse). However, water in a watercourse, such as a stream or river, is the property of the state, held in trust for the public. TEX. WATER CODE ANN. § 11.021 (Vernon 2000); *South Tex. Water Co. v. Bieri*, 247 S.W.2d 268, 272 (Tex.Civ.App.-Galveston 1952, writ ref'd n.r.e.) (holding it is a well-established rule in Texas that waters of public streams belong to the sovereign and are held by the sovereign in trust for the public).

Used in this context, "surface water" is simply a shortened form of the phrase "diffused surface water." BLACK'S LAW DICTIONARY 1585 (7th ed.1999). Thus, "surface water" is simply water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches a bed or channel in which it is accustomed to flow. *Raburn v. KJI Bluechip Investments*, 50 S.W.3d 699, 704 (Tex.App.-Fort Worth 2001, no pet.). Consequently, a distinguishing feature of "surface water" is that it is never found in a natural watercourse. A "watercourse" has been judicially defined as having (1) a bank and bed, (2) a current of water, and (3) a permanent source of supply. *Hoefs v. Short*, 114 Tex. 501, 273 S.W. 785, 787 (1925). Although the source must be permanent, such as a watershed, it need not be continuous, and a watercourse may be dry for long periods of time. *Id.*

Interpreting former enactments of the present statute, the courts of this state, early on, were not particularly concerned with the character of the water being diverted. In other words, it did not seem to matter much whether the water at issue was diffused surface water, impounded water, or water in a watercourse (whether natural or man-made); if water was unreasonably concentrated or diverted onto the plaintiff's land in manner causing him injury, the defendant was liable for the damage. *See Miller v. Letzerich*, 292 S.W. 560 (Tex.Civ.App.-Austin 1927), *aff'd*, 121 Tex. 248, 49 S.W.2d 404 (1932) (holding defendant unlawfully diverted overflow of surface water from lake onto the plaintiff's

property); *St. Louis S.W. Ry. Co. of Tex. v. Wilson*, 273 S.W. 622, 623 (Tex.Civ.App.-Beaumont 1925, no writ) (holding railway was liable when its embankment had the effect of concentrating diffused surface water onto plaintiff's property); *Higgins v. Spear*, 283 S.W. 584, 587–88 (Tex.Civ.App.-El Paso 1926), *aff'd*, 118 Tex. 310, 15 S.W.2d 1010 (1929) (holding defendant was liable for damages when he obstructed a dry river bed that had the effect of diverting water upon his neighbor's land when it rained); *Rattan v. Woods*, 267 S.W. 312 (Tex.Civ.App.-Texarkana 1924, no writ) (holding defendant was liable for damages stemming from the damming of a ditch); *Hammond v. Knight*, 262 S.W. 183, 183–84 (Tex.Civ.App.-Texarkana 1924, no writ) (holding defendant could not lawfully divert water flowing in a natural ravine).

Beginning approximately seventy years ago, however, the courts of this state started inserting the riparian (as opposed to the common) definition of surface water into their construction of the statute. Thus, today the term "surface water," as used in Section 11.086 of the Water Code, means only "diffused surface water." Accordingly, the statute has been effectively neutered by many years of judicial construction. Consider, for example, that where water is concentrated by man-made canals to the detriment of the plaintiff, it has been held that no cause of action lies under the statute.[1] Likewise, where the defendant emptied numerous storm sewers into a creek, allegedly causing it to swell and erode the plaintiff's property, the plaintiff could not prevail under the statute.[2] Similarly, where the defendant al-

---

1. *See Jefferson Cty. Drainage Dist. No. 6 v. Lower Neches Valley Auth.*, 876 S.W.2d 940, 950 (Tex.App.-Beaumont 1994, writ denied) (holding surface waters do not remain surface waters once they enter into a channel that has been touched or modified by the hands of man).

2. *See Dalon v. City of DeSoto*, 852 S.W.2d 530, 538–39 (Tex.App.-Dallas 1992, writ denied) (holding when rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer surface water).

tered the flow of water by widening, deepening, and straightening a natural creek, the plaintiff could not complain of the diversion of water upon his land because such water was not "surface water." [3]

Although it is still possible for a plaintiff to find relief under the statute where the flow of a broad expanse of diffused surface water is diverted by a berm,[4] he has no cause of action stemming from the diversion of water contained in a natural watercourse.[5] Thus, a landowner might divert the entire Brazos River across his neighbor's property without subjecting himself to liability under Section 11.086 of the Water Code. This anomaly seems to have arisen, long ago, when courts erroneously took the definition of "surface water" commonly used in deciding issues of riparian rights and inserted it into a statute having nothing to do with riparian rights.[6] Were we writing on a clean slate, we would likely find the legislature did not intend such a restrictive application of the statute as is now universally accepted by the courts of this state. However, the legislature has had more than half a century to rectify the effect of mounting jurisprudence and amend the statute by defining "surface water." The legislature, however, has not done so. Whether this inaction is due to oversight or legislative approval of the existing jurisprudence, we cannot tell. Although we are not formally bound to follow the decisions of other intermediate courts, we are reluctant to depart from a so long and well-established line of cases, particularly where the legislature has, by its silence, seemingly approved the jurisprudence on this subject.

■ Accordingly, unless or until the legislature amends the statute, we reluctantly hold that the term "surface water," as used in Section 11.086 of the Water Code, means diffused surface water, i.e., water "which is diffused over the ground from falling rains or melting snows, and [it] continues to be such until it reaches some bed or channel in which water is accustomed to flow." City of Keller v. Wilson, 86 S.W.3d 693, 711 (Tex.App.-Fort Worth 2002, pet. filed); Stoner, 392 S.W.2d at 912. In other words, the chief characteristic of "surface water" is that it does not follow a defined course or channel and does not gather into or form a natural body of water. Dalon, 852 S.W.2d at 538; 78 Am.Jur. 2D Waters § 174, at 509–10 (2002). Where rain water is under control by a ditch, tank, pond, or pipe, it no longer qualifies as surface water. Id.

■ Here, the water diverted onto the Dietrichs' property on account of the occluded drain was runoff from the country club property behind the Dietrichs' and Goodmans' homes. The water was concentrated and directed toward the drain by a shallow, but readily visible, natural gully, that extended sixty feet or more up into

---

**3.** See Stoner v. City of Dallas, 392 S.W.2d 910, 911–12 (Tex.Civ.App.-Dallas 1965, writ ref'd n.r.e.).

**4.** See Boatman v. Lites, 970 S.W.2d 41, 44–45 (Tex.App.-Tyler 1998, no pet.) (holding that water in a culvert diverted by the defendant's berm was not "surface water," but diffused surface water that flowed across an expanse of roadway during times of heavy rainfall and was diverted by the defendant's berm was actionable under the statute).

**5.** Dalon, 852 S.W.2d at 538.

**6.** As Justice Frankfurter once observed, "A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas." Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610 (1943) (Frankfurter, J., dissenting).

the wooded area of the country club property.

When rain water fell directly on the tennis courts and wooded acreage on the night of the flood at issue, it undeniably possessed the character of surface water. When the water entered the channel leading to the storm sewer, however, its character changed. The water flowed in a well-defined bed, which led toward the drain inlet. As the rainwater flowed down the channel to the drainage inlet in the Goodmans' backyard,[7] it was blocked by roots, mulch, and dirt. Thus, the water flowed across the corner of the Goodman's backyard onto the Dietrichs' property which had a lower elevation. Until it reached the blocked drain, the water was under the control and direction of a water-course,[8] and thus, it no longer qualified as surface water. *City of Keller*, 86 S.W.3d at 711; *Mitchell*, 730 S.W.2d at 795. As such, there was no diversion of *surface water* when the rain water was redirected from the drain inlet. *Dalon*, 852 S.W.2d at 538. Accordingly, the Dietrichs' first issue is overruled.

### Malice

In their second issue, the Dietrichs allege the Goodmans acted with malice because Mr. Goodman admitted his backyard had standing water on several occasions before the flood at issue, and he failed to remedy the problem. Malice is defined as, "(A) specific intent by the defendant to cause substantial injury to the claimant; or (B) an act or omission: (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, consid-

ering the probability and magnitude of the potential harm to others; and (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). The definition of malice consists of two prongs: part one defines an objective prong, and part two describes the subjective prong. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7). Objectively, the defendant's conduct must involve an extreme risk of harm. *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325–26 (Tex.1993) (discussing common law gross negligence, which, like malice, consists of two prongs). Subjectively, the defendant must have awareness of the extreme risk created by the conduct. *Moriel*, 879 S.W.2d at 22.

In order to obtain exemplary damages, malice must be proved by clear and convincing evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(1) (Vernon 1997). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(2) (Vernon 1997).

■ Here, the Dietrichs failed to present any evidence showing the Goodmans acted with malice. Kevin Dietrich admitted that he did not believe the Goodmans knew the drain inlet was on their property. His opinion is bolstered by the fact that when the Goodmans' home was threatened

---

7. An easement existed on the Goodmans' property which allowed any natural watercourse to run across it.

8. Although one could argue rain falling directly on top of the drainage inlet was surface water because it was not directed in a channel or ever touched by the hands of man, it could amount to only a minute fraction of the flood water that entered the Dietrichs' home.

by the same deluge that flooded the Dietrichs' home, the Goodmans did not clear the drain, but rather, they opened gates and dug ditches to try to prevent their home from being inundated. The evidence also shows that prior to the flood, Mr. Goodman observed standing water on his property, and that he requested on several occasions that the drain inlet be cleared (assuming, of course, that the inlet was located on the recreational property behind his lot). While the evidence showed, and the Goodmans admitted, that they landscaped over the top of the storm sewer, *i.e.*, the manhole cover and surrounding concrete pad, this act was not malicious because there was no drain inlet on the *top* of the structure. Moreover, even if Mr. Goodman had filled the side inlet with dirt and debris, as Mr. Goettee opined, there was no evidence showing Goodman was aware of an extreme degree of risk or the magnitude of the potential harm to the Dietrichs.

Accordingly, the Dietrichs' second issue is overruled.

## Jury Misconduct

In their third issue, the Dietrichs allege they were entitled to a new trial due to jury misconduct. The Dietrichs contend the foreman refused another juror's requests to (1) inquire of the trial judge about the amounts for personal property and the contents of the home, and (2) ask the trial judge if the jury could deliberate for an extra hour before being discharged for the weekend. The Dietrichs also claim that one of the jurors stated during deliberations that he worked in the construction industry, and the Dietrichs were seeking more money than needed to repair their home.

Rule 327 provides in pertinent part, as follows:

> ... when the ground of a motion for new trial, supported by affidavit, is misconduct of the jury ... the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, ... be material, and if it reasonably appears from the evidence from the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

TEX.R. CIV. P. 327(a); *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 446 (Tex. App.-Houston [14th Dist.] 2002, no pet.).

To warrant a new trial for jury misconduct, the Dietrichs had the burden of proving that (1) the misconduct occurred; (2) it was material; and (3) it probably caused injury. TEX.R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex.2000). Whether misconduct occurred is a question of fact for the trial court, and if there is conflicting evidence on this issue, the trial court's finding must be upheld on appeal. *Pharo v. Chambers County, Tex.*, 922 S.W.2d 945, 948 (Tex.1996). Misconduct justifies a new trial only if it reasonably appears from the record that injury probably resulted to the complaining party. *Id.* at 950. Determining the existence of probable injury is a question of law. *Strauss*, 67 S.W.3d at 447.

The Dietrichs alleged the foreman refused to ask the judge a question regarding the inclusion of damages for personal property and refused to ask the judge to deliberate for an additional hour, which substantially affected the jury's answer to question number three.[9] Although

---

**9.** Question number three reads:

What is the difference in the market value in Harris County, Texas, of the residence

the Dietrichs allege harm, the jury found in their answers to questions one and two that no negligence of the Goodmans proximately caused the occurrence in question and that the injury sustained by the Dietrichs was due solely to the negligence of Goettee Construction Company, the developer of the property. Thus, the jury's answer to question number three is immaterial with regard to the Goodmans' liability. Under the circumstances presented here, the Dietrichs cannot show the alleged misconduct had any prejudicial effect. Tex.R. Civ. P. 327(a); *Golden Eagle Archery*, 24 S.W.3d at 372.

 Moreover, with regard to one of the jurors giving his opinion as to the cost of repairs, such conduct does not constitute an "outside influence." Jury misconduct occurs where the jury was influenced by outside sources. *Golden Eagle Archery*, 24 S.W.3d at 370. Outside influence must emanate outside the jury deliberations, and thus, information introduced by a juror to the rest of the panel fails to constitute outside influence. *See id.* Accordingly, the Dietrichs' third issue is overruled.

The judgment of the trial court is affirmed.

SCOTT BRISTER, C.J., dissenting.

owned by KEVIN DIETRICH, DENISE DIETRICH, both individually A/N/F of SETH DIETRICH, immediately before and immediately after the occurrence in question?

"Market value" means the amount that would be paid by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Do not include any amount for any condition resulting from the failure, if any, of the Dietrichs to have acted as persons of ordinary prudence would have done under the same or similar circumstances in caring for and treating the property repairs, if any, that resulted from the occurrence in ques-

SCOTT BRISTER, Chief Justice, dissenting.

Because the flood waters in this case ran through a gully and a few inches of a man-made trench before entering the Goodmans' property, the Court holds they could divert them with impunity. Conceding this absurd result is at odds with the express words of the Texas Water Code, the Court holds we are confined by opinions of our sister courts declaring water diverted into a watercourse or touched by mankind no longer "surface water." I disagree that our sister courts have ever applied such rules to facts like these. Moreover, the Supreme Court of Texas and this Court have adopted a different rule that governs here. Because the Court turns aside from that rule, I respectfully dissent.

Generally, Texas law prohibits a landowner from burdening adjacent lands with water except in the same manner in which it would naturally flow.[1] Thus, a lower estate is obliged to receive water in a natural watercourse (such as a stream or creek), even if those waters have been augmented by runoff from an upper estate.[2] Similarly, a lower estate is obliged to receive surface waters as they naturally flow from an upper estate,[3] but not obliged

tion. Do not include interest on any amount you find.

Answer in dollars and cents for damages, if any.

Answer: *$115000.00*

1. See *Kraft v. Langford*, 565 S.W.2d 223, 228–29 (Tex.1978).

2. See *City of Keller v. Wilson*, 86 S.W.3d 693, 711 (Tex.App.-Fort Worth 2002, pet. filed).

3. See *Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 611–12 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (holding lower estate owner liable under 11.086 for raising grade of property so as to reduce natural runoff).

to do so if they have been channeled by the hand of man.[4]

Nevertheless, the Texas Supreme Court and this Court long ago adopted a modified rule in urban settings, where extensive development makes it difficult or even impossible to establish how water "naturally" flowed.[5] As this Court recognized, "surface water" in such areas is not confined to natural (that is, prehistoric) contours:

> In an urban environment such as Harris County, the natural flow may have been changed numerous times before there is any litigation on the subject. Thus, to force plaintiffs in such actions to prove the natural flow of surface water "untouched by the hand of man" in an urban setting, would frequently deprive such litigants of an adequate remedy. The Restatement of Torts Section 833, comment a (1939) defines interference with the flow of surface water "as an obstruction, diversion or alteration of what has theretofore been regarded as the natural or normal flow of surface waters in the particular place where the interference occurs." Thus, it is the *normal* or natural flow of surface water at the time of diversion that should determine the rights of the parties in an urban area.[6]

While both courts were addressing common-law negligence actions, the absence of a statutory definition of surface water indicates the common law definition should apply.[7] Moreover, the Supreme Court has held the statute was intended to eliminate differences between the civil and common law so that "the civil law rule as to surface water would henceforth govern all property." [8]

There is no question in this case what that normal flow was—the developer of this subdivision constructed a storm sewer drain (no doubt at considerable expense) to receive runoff from the recreation area and channel it through the drain at the rear of the Goodman's property. Whoever covered up the drain clearly diverted the normal flow of surface water in a manner that damaged the Dietrichs' property.[9]

I do not think the opinions of our sister courts require us to ignore the clear words of this statute and adopt an interpretation the Court admits is absurd. While the cases mentioned unfavorably by the Court cite the human-hands and natural-watercourse exceptions to the category of surface waters, they address very different

---

**4.** *See Bunch v. Thomas,* 121 Tex. 225, 49 S.W.2d 421, 423 (1932) (holding lower property owner was not liable under predecessor statute for building levee blocking water coming from uphill that had been channeled through dip across road); *Jefferson County Drainage Dist. No. 6 v. Lower Neches Valley Auth.,* 876 S.W.2d 940, 950 (Tex.App.-Beaumont 1994, writ denied) (holding lower estate owner not liable under section 11.086 for building canals that blocked water coming from upper land in channelized drainage ditches).

**5.** *City of Houston v. Renault, Inc.,* 431 S.W.2d 322, 325 (Tex.1968); *Muzquiz v. R.M. Mayfield & Co.,* 590 S.W.2d 742, 743–44 (Tex.Civ.

App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.).

**6.** *Muzquiz,* 590 S.W.2d at 743–44 (emphasis added).

**7.** *See Parr v. Tagco Indus.,* 620 S.W.2d 200, 206 (Tex.Civ.App.-Amarillo 1981, no writ); *see also Robertson County v. Wymola,* 17 S.W.3d 334, 343 (Tex.App.-Austin 2000, pet. denied) (looking to the common law measure of actual damages in the absence of a statutory definition).

**8.** *See Kraft,* 565 S.W.2d at 229.

**9.** *See* Tex. Water Code § 11.086(a).

situations than those involved here. Two hold that water in a river or stream is not covered by the statute,[10] but neither suggests a gully rises to that level. Even in Texas where creeks can run dry, no one confuses a creek with gully. Two other cases merely hold that upper landowners cannot channel water onto lower ones, or that if they do the lower ones may return the favor by damming the flow to send it back.[11] And one of these latter cases recognizes that surface water may remain surface water even *after* it has been diverted by artificial means.[12]

Additionally, this case is different from others because it addresses the actions a "middle" landowner may take. Assuming the Goodmans could have diverted the flow of water back to the club area from whence it came, the question here is whether they could instead divert it upon their lower neighbors. Only a divided panel of the Third Court of Appeals appears to have answered this question in the affirmative,[13] in an opinion that has been criticized by commentators.[14]

Here, the jury found the Goodmans were not negligent; but the statute imposes a duty of strict liability.[15] There was at least some evidence the Goodmans caused the diversion here (even if in a non-negligent manner) by covering the drain. Thus, the section 11.086 issue should have been submitted to the jury.

"There has been much discussion and even more confusion concerning the rights and duties of adjoining landowners with respect to surface water."[16] By excluding touched-by-human-hands and coming-out-of-a-gully water from the statute, the Court adds to that confusion in this case. Accordingly, I respectfully dissent.

10. *See Dalon v. City of DeSoto*, 852 S.W.2d 530, 539 (Tex.App.-Dallas 1992, writ denied) (holding city not liable under 11.086 for channeling storm sewers into natural creek that allegedly caused erosion of lower owners property because water in creek was not surface water); *Stoner v. City of Dallas*, 392 S.W.2d 910, 912 (Tex.Civ.App.-Dallas 1965, writ ref'd n.r.e.) (holding city not liable under 11.086 for widening creek and thus causing flooding on lower owner's property).

11. *See Boatman v. Lites*, 970 S.W.2d 41, 45 (Tex.App.-Tyler 1998, no pet.) (holding upper owner liable under 11.086 because some water diverted by berm was natural runoff); *Jefferson County Drainage Dist. No. 6*, 876 S.W.2d at 950 (holding lower estate owner not liable under 11.086 for building canals that blocked water draining from upper land in drainage ditches).

12. *See Dalon*, 852 S.W.2d at 539.

13. *See Mitchell v. Blomdahl*, 730 S.W.2d 791, 795 (Tex.App.-Austin 1987, writ ref'd n.r.e.) (holding lower landowner was not liable to middle landowner for blocking flow of water it was receiving, as water came from storm sewers diverted by upper landowner onto middle owners' property).

14. See Douglas G. Caroom and D'Ann Johnson, *Annual Survey of Texas Law: Water Law*, 42 Sw. L.J. 439, 446 (1988) (finding *Mitchell* "troublesome," "inequitable," and that its use of untouched by hands of man criteria as a judicially created exception to section 11.086 that might "swallow the basic rule" of the statute).

15. *See Bily*, 731 S.W.2d at 611.

16. *City of Houston v. Renault, Inc.*, 431 S.W.2d 322, 325 (Tex.1968).