Opinion issued August 17, 2006














In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-01078-CV
__________
 
TEXAS WOMAN’S UNIVERSITY, Appellant
 
V.
 
THE METHODIST HOSPITAL, Appellee
 

 
 
On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2003-31948
 

 
 
O P I N I O N
          Appellant, Texas Woman’s University (“TWU”), challenges the trial court’s
rendition of summary judgment in favor of appellee, The Methodist Hospital
(“Methodist”), in TWU’s suit against Methodist for violation of the Texas Water
Code,


 negligence, nuisance, and trespass arising out of TWU’s damages incurred
during Tropical Storm Allison in June 2001. In four issues, TWU contends that the
trial court erred in granting Methodist’s summary judgment motion (1) on TWU’s
Texas Water Code claim because TWU raised a fact issue “that its damages were
caused by surface waters that had been diverted by Methodist”; (2) on TWU’s
negligence claim because TWU “presented legally sufficient evidence to raise a duty
under section 11.086 of the [Texas] Water Code, an undertaking theory, federal
regulations, and general common-law principles”; (3) on TWU’s nuisance claim
because TWU “raised a fact issue that Methodist had negligently and abnormally
invaded its property interests”; and (4) on TWU’s trespass claim because TWU
“proved Methodist knew with practical certainty that its conduct would cause the
water on its premises to invade TWU’s property.” 
          We affirm in part and reverse and remand in part. 
Factual and Procedural Background
          In its first amended petition, TWU asserted that on June 9, 2001, TWU was
connected to Methodist by an underground tunnel system and that prior to June 9,
2001, TWU and Methodist attended “tunnel dwellers” meetings sponsored by the
Texas Medical Center (“TMC”) for the purpose of planning and implementing a joint
response to potential flooding by all institutions connected to the underground tunnel
system. TWU also asserted that the TMC installed and utilized a monitoring and
warning system to alert TMC institutions to potential flooding and Methodist agreed
to respond to these warnings by “protecting their surface perimeter from water
intrusion” and “instituting their flood protection procedures” when the “Harris Gully
box culverts reached seven feet at the point where they flowed into Braes Bayou.” 
TWU further asserted that Methodist owned “flood logs . . . to block the entry of
water into [Methodist] in the event that rain run-off water levels rose in front of the
driveways and other entrances to [Methodist].” 
          TWU alleged that on June 9, 2001, Methodist “diverted and/or impounded”
surface water into Methodist “from the entrances to [Methodist’s] Neurosensory
Center underground parking garage and [] loading dock” and then “allowed and/or
caused the [] [w]ater to flow from [Methodist] into the [t]unnel and, ultimately, into
the TWU Campus.” TWU further alleged that Methodist “had notice of the potential
for high surface run-off water,” that Methodist ignored the TMC’s warnings
concerning high water and failed to install flood logs at its entrances, and that, as a
result, “surface run-off rain water entered [Methodist] . . . , was allowed to exit
Methodist, traveled and overflowed the [t]unnel, and overflowed and flooded the
TWU Campus.” 
          Methodist filed a summary judgment motion and a supplemental summary
judgment motion. In its original motion, Methodist contended that there is no duty
for one property owner to protect another property owner from flooding and that 
Methodist, in fact, “flooded from overland flow of water from the Harris Gully and/or
the Braes Bayou.” Methodist asserted that the tunnel referred to in TWU’s petition
had been sealed for more than a decade, that the wall held during the storm, and that
the tunnel ran through third party institutions unrelated to Methodist before entering
TWU. 
          Methodist argued that it was entitled to summary judgment on TWU’s
negligence claim because instituting flood protection measures before the storm did
not create any duties to TWU. Methodist attached to its motion the affidavit
testimony of Kevin Edwards, Methodist’s senior project coordinator, who testified
that Methodist instituted flood protection measures “solely for the protection and
benefit” of Methodist. Methodist also cited deposition testimony of Bill Bussman,
TWU’s custodial maintenance supervisor, who agreed that it was TWU’s obligation
“to look out for its own campus.” Methodist asserted that Bussman disclaimed any
reliance by TWU on Methodist for flood protection. Methodist also contended that
TWU’s flooding was not foreseeable, citing Edwards’s testimony that the tunnel
between TWU and Methodist had been sealed and Bussman’s testimony that he did
not think that Methodist “would flood by the direction of the Favrot Methodist
tunnel,” although he stated that he “knew it was possible.”
          Methodist argued that TWU’s nuisance and trespass claims should be
dismissed because TWU presented no evidence of a negligent invasion of a property
interest and no evidence that Methodist’s actions were intentional.
          In its response, TWU asserted that undisputed summary judgment evidence
showed that Methodist owed a duty of ordinary care to TWU. TWU attached to its
response an affidavit from Bussman, who testified:
Before June 8, 2001, I attended [TMC] Tunnel Dwellers meetings
that included representatives of [Methodist]. At these meetings, the
attending institutions, including [Methodist], agreed that in order to
keep from flooding each other through the underground tunnels and
passageways, each institition had to first protect its perimeter from
runoff water from the streets entering the buildings. As such, TWU was
depending upon [Methodist] to use its flood logs, sandbags, and flood
prevention procedures to prevent the tunnels and TWU from flooding
through the tunnel connecting [Methodist] to TWU through [the] Favrot
Hall basement. It was absolutely foreseeable that if [Methodist] did not
protect its perimeter TWU would be flooded through the tunnel. At the
[TMC] Tunnel Dwellers meetings, each institution, including
[Methodist], agreed to protect the other connected institutions, including
TWU, by first protecting that institution’s own perimeter.
 
On the morning of June 9, 2001, I was an eyewitness to TWU’s
flooding. TWU’s perimeter was not breached at the surface level . . . .
Rather, TWU flooded from water coming through the tunnel from
[Methodist]. I also witnessed water flowing from the streets directly
into [Methodist] at various locations and that [Methodist] had not used
its flood logs or sandbags at those locations.
 
In my deposition, I was asked whether I thought that TWU would
flood from the tunnel on June 8–9, 2001. My response was no, and that
response is true today. The reason that I did not think that TWU would
flood through the tunnel was because after all the flood preparations by
the institutions in the [TMC], including the [TMC] Tunnel Dwellers
meetings, it was unthinkable that [Methodist] would fail to protect its
perimeter, especially since all the [TMC] institutions had warnings and
notices of the impending flood probability. It was a certainty that if
[Methodist] did not protect its perimeter, TWU would flood through the
tunnel. [Methodist’s] total failure to act was shocking to me because at
the [TMC] Tunnel Dwellers meetings, [Methodist] employees had
strongly represented that they were prepared and vigilant in heavy rain
situations and had agreed to protect their perimeter, and thereby protect
TWU. . . . Based upon [Methodist’s] representations, TWU relied on
[Methodist] to protect TWU and the tunnels.
 
. . . [B]ased upon the agreements and representations at the [TMC]
Tunnel Dwellers meetings, each institution was also necessarily
protecting the other institutions connected by tunnels from flooding. 
This mutual protection was the sole purpose of these meetings. Each
institution necessarily had to rely on the other institutions’ efforts to
protect the collective perimeter . . . .
 
          Attached to Bussman’s affidavit was a copy of a document titled “Tunnel Flood
Control,” with an “original date” of August 13, 2001 and a date stamp of December
20, 2001, signed by the TMC and its member institutions, including Methodist. 
Bussman stated that this policy reflected “the formal written documentation of the
agreement of the [TMC] Tunnel Dwellers institutions, including [Methodist] and
TWU, to protect each other before June 8, 2001.” All parties agreed that this
document was not signed by the member institutions until after the storm.
          TWU also attached to its response an affidavit from Michael Labroski,
Methodist’s project coordinator during the storm, whose responsibilities included
“coordinating flood protection planning and procedures” for Methodist. Labroksi
testified:
          Before June 8 and 9, 2001 . . . I, on behalf of [Methodist], had
attended numerous [TMC] Tunnel Dwellers Group meetings . . . . At
those meetings, the institutions in the [TMC] connected by underground
tunnels met and discussed . . . the potential for flooding from surface
water in the streets around the [TMC] into and through the perimeters
of the institutions and then into the tunnel system, the flood protection
efforts . . . , [and] the agreed triggers . . . that the institutions would all
use to begin implementing their protection procedures against flooding
. . . . Jay Atkins, Acting Director of The Methodist Hospital Facilities
Management Services, also attended these meetings . . . . Jay’s job . . .
was to make sure that [Methodist] was ready and prepared to protect
[Methodist’s] buildings against flooding. . . . I was an authorized
employee and representative of [Methodist] at those meetings and
attended on behalf of [Methodist].
 
          Before June 8 and 9, 2001, and based on the [TMC] Tunnel
Dwellers Group meetings, [Methodist’s] own knowledge, experience,
and investigation of flood potential and prevention, and findings of
engineers for [Methodist] and [TMC] Tunnel Dwellers Group,
[Methodist]:
 
          (1)     Agreed to immediately begin its ground level flood
protection devices when the Harris County Box
Culvert reached 7 feet;
 
          (2)     Knew that if [Methodist] did not protect its ground
level perimeter from surface water, it would flood
other institutions connected by the tunnel system
including [TWU];
 
          (3)     Agreed with the other institutions in the [TMC]
Tunnel Dwellers Group to protect each other from
flooding through the tunnel system by properly
protecting their surface level perimeters and the
tunnel system from surface water runoff from the
streets;
 
          (4)     Knew that [Methodist] needed 25–30 people to erect
its existing ground level perimeter flood logs and
sand bags and that it took approximately 2 hours to
complete the installation;
 
          (5)     Knew that [Methodist] was the lowest point in the
[TMC] and that the entrance and exit to
[Methodist’s] Neurosensory Building parking garage
were the lowest points on the [Methodist] surface
level perimeter;
 
           . . . .
 
          I talked to [Methodist] employees and made observations to
determine what happened on June 8 and June 9, 2001 . . . . I determined
that the following actions took place:
 
          (1)     [TMC] gave [Methodist] warnings of the heights of
the Harris Gully Box Culvert;
 
          (2)     The heights of the Harris Gully Box Culvert were
shown on the internet throughout the night of June
8–9, 2001;
 
          (3)     Neither the Administrator on call at [Methodist] (the
person who was responsible for implementing the
flood protection response) nor anyone else on the
evening of June 8–9 2001 responded to the [TMC’s]
warnings/notices or to [Methodist’s] own flood
observations until after midnight;
 
          (4)     [Methodist] did not follow its own procedures and
as a result not enough people were present and not
enough time was available to install any of
[Methodist’s] flood logs or sand bags;
 
          (5)     Surface water from the streets entered [Methodist]
buildings through various locations where the flood
logs and sand bags should have been installed to
control and block the water. After the water entered
[Methodist], it funneled down to levels B-1 and B-2
through the Favrot Dock, into Favrot Hall, through
the tunnel and into [TWU];
 
          (6)     The water entered [Methodist] through various
locations, including the garage entrance and exit
ramps to [Methodist’s] Neurosensory Building
parking garage. Flood logs were present and
available to have been installed, yet [Methodist] did
not install its flood logs. . . . . 
 
          After the June 8 and 9, 2001 flood, the [TMC] Tunnel Dwellers
Group wrote down what we called the [TMC] Management Group
Procedures. These procedures set forth in writing what each of the
member institutions had agreed to before the June 2001 flood. I helped
draft these procedures. The written procedures included the agreement
. . . that [Methodist] and other member institutions would immediately
begin direct flood control measures to protect the ground level perimeter
. . . and the tunnel system when the Harris Gully Box Culvert reached 7
feet. Even though on June 8 and 9, 2001 the Harris Gully Box Culvert
reached 7 feet, [Methodist] did not take its required flood control
measures.
 
          TWU also attached to its response minutes from the tunnel dwellers meetings



and a time line of events on June 8–9, 2001, reflecting notices by the TMC to member
institutions regarding street flooding in the medical center. In addition to the
deposition testimony of Bussman and Edwards, TWU also attached the deposition
testimony of Keith Weaver, TMC’s maintenance director, who stated that he
witnessed water flowing from Methodist into an underground tunnel and water
flowing from the street into Methodist’s neurosensory building’s parking garage,
across the bottom of the Favrot dock.
          Methodist then filed its supplemental summary judgment motion, arguing that
because the “waters that damaged Methodist . . . were ‘floodwaters’ reserved to the
exclusive control of the [S]tate of Texas,” Methodist could not be held liable for any
resulting damages. Methodist attached to its motion the deposition testimony of
Larry Mays, TWU’s expert, Mays’s “draft report,” and an affidavit of Phillip Bedient,
Methodist’s expert. Methodist asserted that Mays’s testimony conclusively
established that the waters that flowed from Methodist to TWU were “floodwaters.” 
Methodist cited Mays’s deposition that the storm sewer network was designed for “a
two and three year return period,” that the network would fill up very quickly, even
in minor storms, resulting in “pretty large flows in the streets,” that the storm
delivered rainfall in a volume associated with a one-hundred-year storm, and that the
system was “just not big enough to handle the flows.” Methodist also cited Mays’s
testimony that the TMC was “prone to flooding,” that there is “a tremendous amount
of overland flow that comes down and street floods,” and that Braes Bayou flooded
parts of the TMC. Methodist also cited Bedient’s affidavit, wherein he testified:
          [T]he [TMC] is located at the confluence of the Harris Gully, a
natural watercourse that has been converted to an underground culvert
system, and Braes Bayou. Harris Gully has a defined bank and bed, a
current of water, and a permanent source of supply. Prior to its
conversion to an underground culvert, Harris Gully was a naturally-occurring stream that served as the principal draining mechanism for a
sub-watershed of the Braes Bayou, to which Harris Gully is a tributary.
Included within the sub-watershed drained by Harris Gully are the
[TMC], [and] Rice University, . . . 
 
          On the night of June 8–9, 2001, . . . violent storm cells moved into
the area of the Harris Gully watershed and, beginning at approximately
midnight, began to rain very heavily. The rainfall received at Rice
University over the next three hours constitutes some of the heaviest
ever recorded. . . . The intensity of the rainfall exceeded that which
would be associated with a 500-year storm.
 
          The rate and volume of rainfall quickly overwhelmed the storm
sewer system in the area, which is intended to funnel rainwater into
Harris Gully. As the storm sewers filled up, the water backed into the
streets and began to flow toward the Braes Bayou. At the same time, the
level of water in Braes Bayou began to exceed the height of the box
culvert where Harris Gully discharges its water. As a result, Harris
Gully became unable to discharge properly, and the water in the Gully
began to surcharge, or back up, under pressure. This water pushed its
way out of the storm sewer system and into the streets in the [TMC]. 
One example of this “surcharge” effect is the eyewitness reports of
manhole covers that were blown off by pressurized water.
 
          . . . The [TMC] became overwhelmed by floodwater rushing into
the basin from multiple sources, including surcharge water from Harris
Gully; overland flows of water unable to drain into the Gully; and local
rainfall. These floodwaters moved through the streets of the [TMC] in
great volumes and at high speed.
 
          In its response to Methodist’s supplemental motion, TWU asserted that the
water was not “floodwaters” and that section 11.086 of the Texas Water Code
provided another basis for Methodist’s duty to TWU. TWU attached to its response
Mays’s affidavit, wherein he testified: 
. . . [T]he water that flooded the TWU campus through the tunnel was
rain run off “surface water” that [Methodist] had allowed into its below
street level entrances to its garage and loading dock by failing to use any
of its flood logs and that [Methodist] diverted directly into its basement
B-1 level tunnel and into the tunnel system connecting [Methodist] to
TWU, Favrot Hall . . . .
 
. . . . 
 
          No rivers, streams, beds, banks, ponds, bayous, culverts or pipes
overflowed to flood either [Methodist] or TWU’s campus . . . . 
 
          The water that [Methodist] allowed to pour down from the streets
and the surrounding land into [Methodist’s] underground parking garage
entrance and exit and loading dock had never been under the control of
a river, stream, ditch, tank, pond, bank, pipe, bed or channel before
[Methodist] allowed it to enter [Methodist’s] underground garage. It
had not been under the control of a watercourse defined by a bed or
bank or current before it entered [Methodist]. It was simply rain water
running off and moving by gravity toward the only surface level
watercourse in the area, the Braes Bayou. This water . . . had never even
made it into a storm sewer . . . [and] was not back water from water
overflowing from or out of a watercourse.
 
. . . .
 
          The rain run off surface water . . . naturally flowed overland
towards [Methodist] as part of the watershed not as part of any
watercourse but as surface water moving toward the Braes Bayou.
 
          Mays also testified that Bedient’s affidavit was misleading. Specifically, Mays
testified:
          Dr. Bedient . . . uses the term “Harris Gully watershed” and refers
to the Harris Gully as if it were a watercourse above ground at
[Methodist]. A “watershed” is a topographical designation to describe
an area in which surface water flows during a rain event because of
gravity toward a “watercourse” such as a river, bayou, ditch or creek. 
Every parcel of land on planet Earth is part of some watershed but is not
necessarily part of a “watercourse.”
 
. . . .
 
. . . [T]he water that [Methodist] allowed to enter its hospital and that
flooded TWU’s campus was not water that overflowed the underground
Harris Gully box culverts or backwater created by them being full . . . .
  
. . . . 
 
          Dr. Bedient fails to address either timing of his opinions or to
address the specifics of the water that entered [Methodist] and flooded
TWU through the tunnel. During Tropical Storm Allison the large
rainfall in the upper portion of the Harris Gully watershed became
overland flow across the land including the streets. Water surface
elevations in these streets exceeded the elevations of the exterior
entrance locations to [Methodist] and because [Methodist] failed to
implement their flood protection procedures, they caused the flooding
of [TWU]. These overland flows were never under the control of a
natural watercourse having a bank and bed, a current of water and a
permanent source of supply.
 
          A surcharge or backwater effect was not happening and the Harris
Gully underground culverts were not clogged when water was flooding
into TWU’s campus through the tunnel system. Water first entered
[Methodist] before or around midnight . . . before the Harris Gully
culverts were filled at the downstream end, indicating that the Harris
Gully culvert was not under pressurized conditions when water first
entered [Methodist].
 
. . . . 
 
          The fact that the water that flooded [Methodist] diverted into
TWU’s campus was not surcharged or back water backed up from the
underground Harris Gully box culverts is further shown by the sheer
volumes of the water that [Methodist] flooded into its hospital and the
basements of the other institutions . . . .
 
. . . . 
 
. . . [O]verland flow is “flow of water across the land surface in a down
gradient direction . . . .” Other definitions define overland flow as
“water flowing over the ground surface toward a stream, channel, or
water body” . . . . Overland flow is also sometimes called sheet flow,
urban sheet flow, diffused surface water . . . .
 
          The trial court granted Methodist’s supplemental summary judgment motion,
and dismissed all of TWU’s claims with prejudice. 
 
Standard of Review 
          To prevail on a rule 166a(c) summary judgment motion, a movant has the
burden of proving that it is entitled to judgment as a matter of law and that there is no
genuine issue of material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d
339, 341 (Tex.1995); Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663, 670
(Tex. App.—Houston [1st Dist.] 1996, no writ). We may affirm a summary judgment
only when the record shows that a movant has disproved at least one element of each
of the plaintiff’s claims or has established all of the elements of an affirmative
defense as to each claim. Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex.
1997); Farah, 927 S.W.2d at 670. In deciding whether there is a disputed material
fact issue precluding summary judgment, proof favorable to the non-movant is taken
as true, and the court must indulge every reasonable inference and resolve any doubts
in favor of the non-movant. Randall’s Food Mkts., Inc. v. Johnson, 891 S.W.2d 640,
644 (Tex. 1995); Lawson v. B Four Corp., 888 S.W.2d 31, 33–34 (Tex.
App.—Houston [1st Dist.] 1994, writ denied).
Water Code Violation
          In its first issue, TWU argues that the trial court erred in granting Methodist’s
summary judgment motion on TWU’s claim under section 11.086 of the Texas Water
Code because TWU raised a fact issue “that its damages were caused by surface
waters that had been diverted by Methodist.” TWU notes that Bedient, Methodist’s
own expert, testified that the TMC flooded as a result of floodwaters, overland flow,
and local rainfall, and that Mays, TWU’s expert, provided substantial expert
testimony that TWU incurred damages resulting from the overflow of surface water
diverted by Methodist.


 
          Methodist argues that section 11.086 does not apply because it prohibits only
the diversion of “diffused surface waters,” as that term has been defined by Texas
courts, and that the waters that flooded Methodist and TWU were not diffused surface
waters because they were diverted artificially by the TMC’s streets and drainage
system. Thus, the primary dispute between the parties concerns the proper
characterization of the waters that flooded TWU, and whether such waters give rise
to an actionable claim under section 11.086.
          Section 11.086, “Overflow caused by Diversion of Water,” provides:
(a)     No person may divert or impound the natural flow of surface
waters in this state, or permit a diversion or impounding by him
to continue, in a manner that damages the property of another by
the overflow of the water diverted or impounded.
 
(b)     A person whose property is injured by an overflow of water
caused by an unlawful diversion or impounding has remedies at
law and in equity and may recover damages occasioned by the
overflow.
 
Tex. Water Code Ann. § 11.086(a)–(b) (Vernon 2000). Damages are allowed under
section 11.086 when “(1) a diversion or impoundment of surface water, (2) causes,
(3) damage to the property of the plaintiff landowner.” Dietrich v. Goodman, 123
S.W.3d 413, 417 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The term surface
water, as used in section 11.086, is not defined in the Water Code, but has been
interpreted by Texas courts to mean water “which is diffused over the ground from
falling rains or melting snows, and [it] continues to be such until it reaches some bed
or channel in which water is accustomed to flow.”


 Id.; Dalon v. City of DeSoto, 852
S.W.2d 530, 538–39 (Tex. App.—Dallas 1992, writ denied); see also Raburn v. KJI
Bluechip Invs., 50 S.W.3d 699, 704 (Tex. App.—Fort Worth 2001, no pet.) (defining
surface water as “water or natural precipitation diffused over the surface of the
ground until it either evaporates, is absorbed by the land, or reaches a bed or channel
in which it is accustomed to flowing.”). Texas courts have further held that surface
water is never found in a natural watercourse having “(1) a bank and bed, (2) a
current of water, and (3) a permanent source of supply.” Dietrich, 123 S.W.3d at 418 
(citing Hoefs v. Short, 114 Tex. 501, 273 S.W. 785, 787 (1925)). “Although the
source [of a watercourse] must be permanent, such as a watershed, it need not be
continuous, and a watercourse may be dry for long periods of time.” Id. 
          Additionally, “[t]he chief characteristic of ‘surface water’ is that it does not
follow a defined course or channel and does not gather into or form a natural body of
water.” Id. at 419; see also Dalon, 852 S.W.2d at 538. “When rainfall is under
control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface
water.” Dalon, 852 S.W.2d at 538–39 (noting that creek in which water flowed was
natural waterway, and that once rainfall entered creek, it was no longer surface
water). Another “chief characteristic of surface water is its inability to maintain its
identity and existence as a body of water, distinguishing it from water flowing in a
natural watercourse.” Id. at 539. 
          In contrast, “[f]loodwaters are those which, generally speaking, have
overflowed a river, stream or natural water course and have formed a continuous body
with the water flowing in the ordinary channel.” Valley Forge Ins. Co., 174 S.W.3d
at 258 (quoting Sun Underwriters Ins. Co. v. Bunkley, 233 S.W.2d 153, 155 (Tex.
Civ. App.—Fort Worth 1950, writ ref’d)); see also Raburn, 50 S.W.3d at 704 (“Flood
waters are waters above the regular flow of a stream”); Dalon, 852 S.W.2d at 538 (“If
the floodwater forms a continuous body with the water flowing in the ordinary
channel, or if it temporarily overflows presently to return, as by recession of the
waters, it is to be regarded as still a part of the stream.”) (quoting 78 Am. Jur. 2d
Water § 225 at 670 (1975)). 
          The determination of whether the waters that flooded TWU are surface waters
or floodwaters is important because, as both parties agree, the State has the ownership
of and the non-delegable duty to control floodwaters and to maintain the appurtenant
instrumentalities used for flood control, and Methodist would not be liable if TWU
was flooded by floodwaters. See Raburn, 50 S.W.3d at 704 (citing Tex. Const. art.
XVI, § 59) ( “The conservation and development of all of the natural resources of this
State, . . . including the control, storing, preservation and distribution of its storm and
flood waters, . . . are each and all hereby declared public rights and duties.”).
          Here, it is undisputed that the storm dumped a significant amount of rainfall 
on the TMC and that, at the moment the rain was falling from the sky into the areas
of the TMC, the rain was properly characterized as surface water. However, the
parties presented conflicting evidence on whether the water that flooded Methodist,
and eventually TWU, transformed from diffused surface waters, which all agree
would be actionable under section 11.086 and general negligence theories, into
floodwaters, which would not. For example, Mays testified in his deposition that
Methodist began to flood before Harris Gully


 filled and that water was coming into
Methodist due to “street flooding.” Mays further stated that water from the streets
entered Methodist at five locations and that if Methodist had properly and timely
installed its flood barriers, TWU would not have flooded. More significantly, in his
affidavit, Mays testified that TWU was flooded through the tunnel by “rain run off”
that Methodist allowed into its below street level entrances by failing to use its flood
logs.


 Mays maintained that “[n]o rivers, streams, beds, banks, ponds, bayous,
culverts or pipes overflowed to flood” the two institutions and that the water that
poured into Methodist’s underground parking garage entrance and exit and loading
dock from the streets and land surrounding Methodist was never “under the control
of a river, stream, ditch, tank, pond, bank, pipe, bed, or channel.” Rather, Mays
stated, the water “was simply rain water running off and moving by gravity toward
the only surface level watercourse in the area” and that the “rain run off surface water
. . . naturally flowed overland towards [Methodist] as part of the watershed.” 
Opinions from our sister courts suggest that a watershed itself does not constitute a
watercourse, and this conclusion is consistent with Mays’s testimony that any piece
of land could be characterized as a watershed. Otherwise, as soon as rain hit “any
piece of land,” the rain would automatically lose its classification of diffused surface
water, and section 11.086 would be rendered meaningless.
          Mays also specifically disputed some of Bedient’s opinions regarding the
source of Methodist’s and TWU’s flooding. For example, Mays noted that some of
Bedient’s opinions relied upon by Methodist in its summary judgment motions related
in a more general fashion to the flooding of the entire TMC area and did not address
the actual flooding sources or timing at issue in this case. 
          As to Methodists’s alleged diversion or impoundment of surface water, Mays
testified that water entered Methodist from multiple entrances and that Methodist
allowed water to pour into its below-street-level entrances to its garage and loading
dock by failing to use any of its flood logs. He stated that Methodist diverted this
water into its basement tunnel and into the tunnel system connecting to TWU, and
that TWU would not have flooded but for Methodist’s diversion or impoundment of
this water. Labroski, Methodist’s project coordinator, testified that “[s]urface water
from the streets entered [Methodist] buildings through various locations where the
flood logs and sand bags should have been installed to control and block the water,”
that “[a]fter the water entered [Methodist], it funneled down to levels B-1 and B-2,
through the Favrot Dock, into Favrot Hall, through the tunnel and into [TWU],” and
that “[t]he water entered [Methodist] through various locations, including the garage
entrance and exit ramps to [Methodist’s] Neurosensory Building parking garage.”          In regard to the elements of diversion or impoundment, the parties refer us to
Burbridge v. Rich Props., Inc., 365 S.W.2d 657 (Tex. Civ. App.—Houston [1st Dist.]
1963, no writ). In Burbridge, decided under the predecessor statute to section 11.086,
the owner of a building sued the owners of an adjoining building for permitting water
to be impounded in the adjoining building, which then flowed or seeped into the
plaintiff’s building. Id. at 658. The court quoted the “generally accepted view that
a landowner has no natural right, by means of any building or other structure placed
on his land, to discharge on adjoining premises the water which may accumulate from
. . . natural causes.” Id. at 660. The jury found that substantial quantities of water
entered the plaintiff’s building from the adjoining building, and the court held, based
on the undisputed evidence that water was permitted to accumulate in the adjoining
building, that the plaintiff building owner was entitled to damages. Id. at 661.           Similarly, here, an examination of the voluminous summary judgment record
reveals that there is at least some evidence that Methodist diverted or impounded
surface water through its low level entrances and exits and into tunnels, basements,
and loading docks and, ultimately, into TWU. We hold that TWU raised a fact issue
as to whether Methodist diverted or impounded surface waters through tunnels and
passageways to TWU in violation of section 11.086 of the Texas Water Code. 
Accordingly, we further hold that the trial court erred in granting Methodist summary
judgment on TWU’s section 11.086 claim.
          Methodist would have been entitled to summary judgment if the undisputed
evidence showed that TWU was flooded exclusively due to a back water effect or
surcharge from Braes Bayou, which both parties agree constitutes a natural
watercourse. Such waters would be properly considered floodwaters and subject to
the exclusive control of the State. See Bunkley, 233 S.W.2d at 156 (noting that it was
“undisputed that the water was not backed up from a river, creek or other natural
watercourse” and holding that water could not be regarded as floodwaters). TWU
even concedes that, under the law, at least as it has been interpreted by our sister
courts, it would have no actionable claim against Methodist under section 11.086 if
Methodist had diverted water surcharged from Braes Bayou. However, the evidence
presented failed to establish, as a matter of law, whether Methodist and TWU were
flooded as a result of (1) a surcharge or “back water effect” from Braes Bayou, (2) a
storm sewer network that was either completely full, unable to accept any more water,
or that was simply inadequate, unable to drain water being channeled into the system
fast enough into Harris Gully, causing the water to back into the streets and flood the
TMC, or (3) simply, a volume of rain that rapidly filled the streets of the TMC and
the surrounding watershed, causing the level of the accumulated rain water to rise
quickly to the point that it poured into the unprotected lower level entrances and exits
of Methodist. We recognize that, to some extent, there may be a fine line between the
above three possibilities, especially the latter two, and that there may be other
possible causes for the flooding of Methodist and TWU. However, this is precisely
the reason why, at this stage of the litigation, judgment as a matter of law on this issue
is not appropriate. 
          Methodist also urges that it cannot be liable under section 11.086 because
diffused surface waters are those that have been “untouched by the hands of man.” 
Methodist reasons that once diffused surface water becomes concentrated or
channeled by manmade changes to the natural formation of the land, the water,
although technically still surface water, is no longer diffused surface water and is
instead floodwater under the exclusive control of the State. Methodist asserts that “it
would be difficult to imagine a more artificial environment than the TMC.” 
Methodist cites Mays’s deposition testimony that, in the event of a one-hundred-year
storm, “the sewer network itself fills up very quickly and then the flow goes into the
streets and the streets serve . . . as the drainage channel,” that the water ponds and
travels in the TMC streets, and that streets serve as a “secondary conveyance system”
when the storm sewers are full.
          We note first that Mays clearly testified that, at the time Methodist and TWU
flooded, Harris Gully was able to discharge properly and there was no back flow
effect occurring in the streets of the TMC. To the extent Mays offered contradictory
testimony that supports Methodist’s theory, his testimony did not affirmatively
establish that Methodist and TWU flooded as a result of a surcharge or back water
effect from Braes Bayou or Harris Gully.  
          Second, as TWU notes in its reply brief, if we adopted Methodist’s
construction that surface water is no longer diffused surface water once it has been
in any way “touched by the hands of man,” section 11.086 would be rendered
meaningless. Methodist’s construction would require a party to show that water was
diverted or impounded by a person, but that it had not been “touched by the hands of
man.” 
          Third, this “untouched by the hands of man” exception is not supported in the
case law. In Bunch v. Thomas, 49 S.W.2d 421, 423 (Tex. 1932), the Texas Supreme
Court stated, in addressing the predecessor statute


 to section 11.086:
It is the settled law of this State that while under the statute quoted the
lower estate must receive the surface waters naturally flowing thereon
from a higher estate, yet it is not required to receive those waters except
in their natural condition, untouched by the hands of man.
 
Id. The court in Bunch went on to hold that a lower landowner was entitled to
maintain an embankment built to block water that poured onto her land through
ditches cut into an adjoining tract of land by a neighboring landowner. Id. at 424. 
The court noted that the law could be correctly stated as follows: 
Where the owner of higher lands constructs a ditch to drain the surface
water therefrom, which increases the flow of water upon a lower
proprietor, or which throws the water upon his land in a manner
different from that in which it would have naturally flowed, to the
latter’s injury, it has been held that the former is liable for the injury thus
occasioned.
 
Id. at 423. Thus, Bunch does not support the “untouched by the hands of man”
exception suggested by Methodist. Nothing in Bunch, or any other authority which
this Court is bound to follow, suggests that TWU is precluded from seeking to
recover the damages it sustained by Methodist’s impoundment or diversion of surface
waters simply because these surface waters fell on an “artificial environment,” such
as the TMC.


 Moreover, Methodist has not shown, as a matter of law, that the streets
in the TMC, including those from which Methodist flooded, qualify as a watercourse
under Texas law and, consequently, that any waters pooling or flowing in the TMC
streets would automatically lose their classification as diffused surface waters.
          We also address the distinguishable facts in Dietrich, which both parties cite
extensively to support their opposite conclusions.


 In Dietrich, the plaintiff asserted
claims of negligence, trespass, and violation of section 11.086 against his neighbor
who allegedly landscaped around and over a storm sewer on his property, occluding
the storm drain and diverting water into the plaintiff’s home on a neighboring lot. 
123 S.W.3d at 416–17. Before the water was diverted, it had been “concentrated and
directed toward the drain by a shallow, but readily visible, natural gully, that extended
sixty feet or more into the wooded area.” Id. at 419–20. The court stated that, under
the law as it currently existed, a plaintiff had no cause of action “stemming from the
diversion of water contained in a natural watercourse.” Id. at 419. The court
summarized its holding as follows:
          When rain water fell . . . on the night of the flood at issue, it
undeniably possessed the character of surface water. When the water
entered the channel leading to the storm sewer, however, its character
changed. . . . Until it reached the blocked drain, the water was under
the control and direction of a watercourse, and thus, it no longer
qualified as surface water. As such, there was no diversion of surface
water when the rain water was redirected from the drain inlet.
 
Id. at 420 (internal citations omitted).
          Thus, the holding of Dietrich is actually limited to the fact that, under section
11.086, a landowner has no cause of action for damages arising from the diversion
of a water flowing in a watercourse (in that case, a natural gully) because such waters
are no longer diffused surface waters. Id. Here, as we stated above, Methodist did
not establish, as a matter of law, that Methodist and TWU were flooded by waters
flowing in a watercourse. Rather, TWU presented evidence creating a fact issue as
to whether the waters that flooded it qualified as diffused surface waters.



          In sum, nothing in section 11.086 suggests that accumulated rainfall is no
longer diffused surface water once it has been, in any way, diverted by artificial
means or touched by the hands of man. See Dalon, 852 S.W.2d at 539 (stating,
“[s]urface water loses its identity as surface water when it becomes a part of [a] creek
whereas, in the cases cited by appellants, the surface water remains surface water
since it is being diverted by artificial means.”). 
          We sustain TWU’s first issue.
Negligence
          In its second issue, TWU contends that the trial court erred in granting
Methodist summary judgment on TWU’s negligence claim because TWU “presented
legally sufficient evidence to raise a duty under section 11.086 of the [Texas] Water
Code, an undertaking theory, federal regulations, and general common-law
principles.”
          First, we note that section 11.086 “imposes a duty of strict liability.” See
Dietrich, 123 S.W.3d at 424 (J. Brister, dissenting); see also Bily v. Omni Equities,
Inc., 731 S.W.2d 606, 611 (Tex. App.—Houston [14th Dist.] 1987, writ ref’d n.r.e.)
(stating that action based upon violation of section 11.086 is not dependent upon
finding of negligence). Second, Methodist’s assertion that the “key issue presented
to this Court is simply whether the overland flows of water . . . were surface water or
flood waters,” is disposed of by our previous holding that TWU raised a fact issue on
this point. Thus, Methodist cannot defeat TWU’s negligence claim, as a matter of
law, on the basis that it did not owe a duty to control floodwaters because such waters
were subject to the exclusive control of the State. 
          Thus, we turn to TWU’s first proposed source of a negligence duty, an
undertaking theory. The Texas Supreme Court has stated that “one who voluntarily
undertakes an affirmative course of action for the benefit of another has a duty to
exercise reasonable care that the other’s person or property will not be injured
thereby.” Colonial Sav. Ass’n v. Taylor, 544 S.W.2d 116, 119 (Tex. 1976). The court
in Taylor then cited section 323 of the Second Restatement of Torts, which provides: 
One who undertakes, gratuitously or for consideration, to render
services to another which he should recognize as necessary for the
protection of the other’s person or things, is subject to liability to the
other for physical harm resulting from his failure to exercise reasonable
care to perform his undertaking, if
 
(a)     his failure to exercise such care increases the risk of such harm,
or
 
(b)     the harm is suffered because of the other’s reliance upon the
undertaking.
 
Id. at 119–20 (citing Restatement (Second) of Torts § 323 (1965)); see also
Torrington Co. v. Stutzman, 46 S.W.3d 829, 838–39 (Tex. 2000). Thus, to establish
a negligent undertaking, a plaintiff must show (1) the defendant undertook to perform
services that it knew or should have known were necessary for the plaintiff’s
protection, (2) the defendant failed to exercise reasonable care in performing those
services, and either (3) the plaintiff relied upon the defendant’s performance, or (4)
the defendant’s performance increased the plaintiff’s risk of harm. Torrington Co.,
46 S.W.3d at 838–39.
          Here, TWU presented evidence that Methodist, through representatives,
attended meetings prior to the storm to address concerns about possible flooding
through tunnels that connected TMC institutions. Bussman, TWU’s custodial
maintenance supervisor, testified that, before the storm, he attended tunnel dwellers
meetings with Methodist representatives and that the attending institutions, including
Methodist, agreed to keep from flooding each other through the underground tunnels
and passageways by protecting their perimeters. TWU depended upon Methodist’s
representations that it would install its flood logs and follow flood prevention
procedures to prevent the tunnels and TWU from flooding. Moreover, it was
foreseeable that if Methodist did not protect it perimeter, TWU would flood. 
Bussman further testified that Methodist employees had agreed to protect their
perimeter and strongly represented that they were prepared and vigilant. Again, TWU
relied on Methodist to protect the tunnels and TWU. 
          TWU also presented the affidavit testimony of Labroski, Methodist’s project
coordinator, who testified that his responsibilities included coordinating flood
protection planning and attending tunnel dwellers group meetings as an authorized
representative of Methodist. At these meetings, the institutions discussed the
potential for flooding from surface water through their perimeters and then into the
tunnel system and the agreed triggers that the institutions would all use to respond to
potential flooding. More specifically, Labroski testified that Methodist “[a]greed to
immediately begin its ground level flood protection devices when the Harris County
Box Culvert reached 7 feet,” “[k]new that if Methodist did not protect its ground level
perimeter from surface water” it would flood TWU and other institutions, and agreed
to protect other institutions by protecting its surface level perimeters and the tunnel
system from surface water runoff. He also noted that Methodist knew that it needed
twenty-five to thirty people, working approximately two hours, to erect its flood
protection devices. Based on his meetings with other Methodist employees after the
storm, Labroski determined that the TMC gave Methodist warnings; that Methodist
failed to timely respond to the warnings and its own flood observations; that
Methodist failed to secure enough people and time to install its flood protection
devices; and that as a result, surface water from the streets entered Methodist and
ultimately flowed to Favrot Hall and through the tunnel into TWU.
          The above testimony provides at least some evidence that Methodist undertook
to perform services that it knew or should have known were necessary for TWU’s
protection, that Methodist failed to exercise reasonable care in performing those
services, that TWU relied upon Methodist’s performance, and that Methodist
increased TWU’s risk of harm. We hold that TWU raised a fact issue as to whether
Methodist owed TWU a duty under an undertaking theory. Accordingly, we further
hold that the trial court erred in granting Methodist summary judgment on TWU’s
negligence claim. Having concluded that TWU raised a fact issue as to whether
Methodist owed TWU a duty under an undertaking theory, we need not address
TWU’s arguments that it presented legally sufficient evidence to raise a duty under
federal regulations and general common law.
          We sustain TWU’s second issue.
Nuisance
          In its third issue, TWU argues that the trial court erred in granting Methodist
summary judgment on TWU’s nuisance claim because TWU “raised a fact issue that
Methodist had negligently and abnormally invaded its property interests.”  
          A nuisance is “a condition that substantially interferes with the use and
enjoyment of land by causing unreasonable discomfort or annoyance to persons of
ordinary sensibilities.” Schneider Nat’l Carriers, Inc. v. Bates, 147 S.W.3d 264, 269
(Tex. 2004); Ronald Holland’s A-Plus Transmission & Auto., Inc. v. E-Z Mart Stores,
Inc., 184 S.W.3d 749, 758 (Tex. App.—San Antonio 2005, no pet.). “To be
actionable, a defendant must generally engage in one of three kinds of activity: (1)
intentional invasion of another’s interest; (2) negligent invasion of another’s interests;
or (3) other conduct, culpable because abnormal and out of place in its surroundings,
that invades another’s interest.” E-Z Mart Stores, Inc., 184 S.W.3d at 758.



          Methodist’s summary judgment motion only asserted that because TWU could
not show that Methodist owed any duty to TWU, TWU’s nuisance claim necessarily
failed. However, we have held that TWU raised a fact issue on its negligence claim,
and the evidence supporting TWU’s negligence claim against Methodist also supports
its nuisance claim. Thus, we hold that the trial court erred in granting Methodist’s
summary judgment motion on TWU’s nuisance claim. 
          We sustain TWU’s third issue.
Trespass
          In its fourth issue, TWU argues that the trial court erred in granting Methodist
summary judgment on TWU’s trespass claim because TWU “proved Methodist knew
with practical certainty that its conduct would cause the water on its premises to
invade TWU’s property.” Methodist contends that it is not liable in trespass because
TWU presented no evidence that Methodist intended or knew with a practical
certainty that water would first enter and flood Methodist and that such water would
leave Methodist and travel through a TMC tunnel into Favrot Hall, the Institute of
Religion, and then flood TWU. 
          A claim for trespass to real property requires a showing of an unauthorized
physical entry onto the plaintiff’s property by some person or thing. E-Z Mart Stores,
Inc., 184 S.W.3d at 758. “The entry need not be in person but may be made by
causing or permitting a thing to cross the boundary of a property.” Id. To recover
damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns
or has a lawful right to possess real property, (2) the defendant entered the plaintiff’s
land and the entry was physical, intentional, and voluntary, and (3) the defendant’s
trespass caused injury to the plaintiff. Wilen v. Falkenstein, 191 S.W.3d 791, 798
(Tex. App.—Fort Worth 2006, pet. filed) (citing generally Stone Res., Inc. v. Barnett,
661 S.W.2d 148, 151 (Tex. App.—Houston [1st Dist.] 1983, no writ)). 
          Concerning the intent element of the tort, the only relevant intent is that of the
actor to enter the property. Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 827
(Tex.1997); see also Malouf v. Dallas Athletic Country Club, 837 S.W.2d 674, 676
(Tex. App.—Dallas 1992, writ dism’d w.o.j.) (stating, “trespass is usually regarded
as an intentional tort in the sense that it involves an intent to commit an act which
violates a property right, or would be practically certain to have that effect, although
the actor may not know that the act he intends to commit is such a violation”).
          Here, TWU presented no evidence that Methodist intended to commit a
trespass that violated TWU’s property rights or would be practically certain to violate
TWU’s property rights. See Gen. Tel. Co. v. Bi-Co Pavers, 514 S.W.2d 168, 170
(Tex. App.—Dallas 1974, no writ). Simply put, TWU presented no evidence that
Methodist failed to timely install its flood protection devices and take other
reasonable measures with the intent to flood both Methodist and TWU. TWU’s
allegations concerning Methodist’s failure to act are necessarily based on Methodist’s
negligence in failing to take proper flood prevention procedures, not on an intentional
act. Thus, TWU is properly relegated to negligence-based actions and its action for
a violation of section 11.086 of the Texas Water Code. Accordingly, we hold that the
trial court did not err in granting Methodist summary judgment on TWU’s trespass
claim.
          We overrule TWU’s fourth issue.  
 
 
 
 
 
 
Conclusion
          We affirm the trial court’s summary judgment in favor of Methodist on TWU’s
trespass claim, and we reverse the trial court’s summary judgment in favor of
Methodist on TWU’s claim for violation of section 11.086 of the Texas Water Code,
negligence, and nuisance. We remand for further proceedings consistent with this
opinion. 
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Jennings, Hanks, and Higley.