

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LUIS SALAZAR, | § | No. 08-11-00335-CV |
| Appellant, | § | Appeal from |
| v. | § | 327th District Court |
| WILLIAM SANDERS AND PATRICIA SANDERS, | § | of El Paso County, Texas |
| Appellees. | § | (TC # 2007-1526) |

## O P I N I O N

Luis Salazar appeals a take-nothing judgment entered in favor of William and Patricia Sanders on Salazar's claims against them for private nuisance, trespass, loss of lateral support, breach of contract, and violations of the Texas Water Code. For the reasons that follow, we affirm.

## STATEMENT OF FACTS

Luis Salazar has resided in the Upper Valley district of El Paso, Texas, on a three-acre property located on Boy Scout Lane since he purchased it on May 17, 2001. His neighbors, William and Patricia Sanders, have resided on adjacent property located on Boy Scout Lane immediately to the southeast of Salazar's property, since July 16, 1975. Although the area of the Upper Valley in which these properties are located is largely residential, many of the properties,

including those of Salazar and the Sanderses, have irrigation rights.[1]

An earthen irrigation ditch approximately six feet in width and two-and-a-half feet deep runs between the Salazar Estate and the Sanders Estate. The ditch is linked by floodgate to an EPCWID mainline canal serving several neighborhood properties. The Sanderses and a few other neighbors use this ditch to irrigate their property. The Salazar Estate is served by a different irrigation ditch. Mr. Sanders has served as the *alcalde* for the irrigation ditch on his property for approximately twenty years. The *alcalde* is the person who opens the floodgate and coordinates the irrigation with the neighbors.

In September 2005, a dispute arose between Salazar and the Sanderses over a flooding event that affected both properties. Salazar maintained that the Sanderses had left the floodgate open and the irrigation ditch had overflowed onto the Salazar Estate. Mr. Sanders disputed Salazar's version of the events. Mr. Sanders noticed irrigation water from Salazar's property was coming onto his pasture so he and his wife walked over and spoke to Salazar who was in front of his house. Mr. Sanders did not consider it a major issue but thought he should mention it to Salazar. Salazar told them he was not going to do anything about it and walked away. After they returned home, Salazar walked over and explained to Mr. Sanders that his neighbors were flooding him and he was not going to tell them to stop. In early 2006, Salazar spoke with Mr. Sanders about the property line and the irrigation ditch. Salazar pointed out a surveyor's pin laid as part of a survey performed by Manuel Calderon of Calderon Engineering ("the Calderon survey" and "the Calderon Line"). He told Mr. Sanders that the surveyor's pin indicated that the northwest bank of the ditch was located partially on the Salazar Estate, and asked Mr. Sanders to

---

[1] The irrigation water is delivered from the Rio Grande River by the El Paso County Water Improvement District No. 1 (referred to as EPCWID). *See* TEX.SPECIAL DISTRICTS LOCAL LAWS CODE ANN. §§ 9303.001, 9303.051-.054 (West Pamph. 2013). EPCWID is required by statute to maintain a website, TEX.SPECIAL DISTRICTS LOCAL LAWS CODE ANN. § 9303.054(a), which can be found at www.epcwid1.org.

relocate the ditch further inside the Sanders Estate. A second pin placed during an earlier survey by Robert Seipel ("the Seipel survey" and "the Seipel Line") indicated that the boundary line between the Salazar and Sanders properties was at a point two feet away from the northwest bank of the ditch, inside what Salazar claimed was part of the Salazar Estate. An old wire fence stood on the Salazar Estate where the Seipel survey indicated the property line existed. Salazar was apparently aware of the location of the pin from the Seipel survey at the time he showed Mr. Sanders the pin from the Calderon survey, but did not tell Mr. Sanders of the second pin's existence. Salazar asked Mr. Sanders to share a fence along the Calderon Line but Mr. Sanders did not want to pay for it. Salazar volunteered to pay for the fence and he asked Mr. Sanders to let him know if he agreed. Salazar also asked him to relocate the irrigation ditch because he claimed it was located partially on the Salazar Estate. Mr. Sanders refused to move the irrigation ditch, but he agreed that Salazar could build a new fence along the Calderon line. Mr. Sanders left Salazar a voicemail on February 7, 2006, indicating his agreement about Salazar building the fence:

> MR. SANDERS: Good morning, Luis. This is Bill Sanders, your back neighbor. I talked with Joseph Bencomo.[2] And, you know, I mean, that's your property and -- and just go ahead -- I think we both agree you ought to just go ahead and put in your fence, and we'll figure out how we'll work around it. So we're fine with it. So do what you need to do. I mean, of course, I'd like for you to make sure not to mess up anything on my side of the fence. But do whatever you need to to [sic] put it in, and just go for it, and when it's done are we'll figure out how we're going to work around it. Okay. Call me if you've got any questions. Bye.

Salazar testified that he had a conversation with Mr. Sanders the day after receiving the voicemail. They "laid out a plan" where Salazar would build up his side of the property which had eroded and Mr. Sanders agreed to "re-establish the ditch bank on his side of the property where it wouldn't undermine the fence that [Salazar] would build." Salazar claimed that in

---

[2] Mr. Sanders testified that Bencomo is a neighbor.

March of 2006, Mr. Sanders refused to build a berm next to the irrigation ditch because he had changed his mind. According to Salazar, water from the Sanderses' irrigation ditch overflowed onto his property in March and April of 2006. Salazar's attorney sent the Sanderses a letter on March 22, 2006 stating that their irrigation ditch had "shifted" onto the Salazar Estate, and demanded that they either remove or stabilize it. The letter referenced the agreement between Salazar and the Sanderses' to "improve the banks of the ditch to eliminate the problem." Mr. Sanders responded in writing to the letter and informed counsel that there was a dispute about the boundary line because he had recently learned that Salazar's surveyor had used a different corner point than the one established in an earlier survey. He also disputed that there was an agreement to improve the banks of the ditch and stated his belief that Salazar might have created the problem "when he recently removed the ditch banks that contain my irrigation water." Mr. Sanders suggested that the first step was to identify the boundary line. Salazar's attorney wrote a second letter to the Sanderses on April 11, 2006 dismissing any question about a boundary dispute and demanding that the Sanderses move the ditch by April 25, 2006.

Salazar also reported the Sanderses to EPCWID which ordered them to suspend irrigation of the Sanders Estate until they had resolved the dispute with Salazar. Mr. Sanders disputed that water from his irrigation ditch ever went onto Salazar's property, but he did not want his neighbors to be deprived of water because of his dispute with Salazar. Consequently, he attempted to resolve the dispute by reconstructing the irrigation ditch. He dug a vertical wall at a 90-degree angle into the ditch on the Sanders Estate side of the Calderon Line and lined the vertical wall with corrugated metal fixed into the soil bed.

At some point during the dispute, Salazar had put up a length of string meant to demarcate the boundary line between the Salazar Estate and the Sanders Estate as established by

the Calderon survey. Salazar asserted that Mr. Sanders and his agents repeatedly trespassed onto the Salazar Estate during construction by crossing the Calderon Line, but Mr. Sanders expressly denied ever trespassing on Salazar's property. Salazar also took issue with the reconstructed irrigation ditch. Although he admitted that the reconstructed ditch fixed the flooding, Salazar alleged that water seeped between some of the metal panels onto his property so that the soil next to the irrigation ditch was saturated during irrigation season every year.

In addition to the flooding issues, Salazar and the Sanderses continued to dispute ownership of the two-foot strip of land between the Calderon Line and the Seipel Line. In an effort to resolve the dispute with Salazar, the Sanderses quitclaimed the disputed strip of land to Salazar on June 25, 2009. In the quitclaim deed, which Salazar accepted, there is language indicating that the irrigation ditch and its accompanying easement lie squarely within the boundary lines of the Sanders Estate.

In his fourth amended petition, the live pleading in this case, Salazar brought claims against William and Patricia Sanders for: (1) a declaratory judgment under TEX.CIV.PRAC.& REM.CODE ANN. § 37.003 (West 2008); (2) interference with lateral support at common law; (3) trespass to real property; (4) private nuisance on the basis of intentional, negligent, and abnormal conduct; (5) public nuisance; (6) violations of Sections 11.086 and 11.088 of the Texas Water Code; (6) breach of oral contract; (7) promissory estoppel; and (8) attorney's fees. The trial court directed verdicts in favor of the Sanderses on interference with lateral support and the Texas Water Code causes of action. The court also directed verdicts in favor of the Sanderses *sua sponte* on the issues of public nuisance, private nuisance, declaratory relief, and promissory estoppel. The parties stipulated that the Sanderses' request for attorney's fees based on the Declaratory Judgment Act would be submitted to the trial court rather than the jury. Thus, only

the issues of breach of contract and trespass were submitted to the jury. On those issues, the jury found in favor of the Sanderses. The trial court also awarded attorney's fees to the Sanderses in the amount of $20,000.

## PRIVATE NUISANCE

In Issues One through Three, Salazar challenges the directed verdict granted with respect to the private nuisance claim. He contends that there is more than a scintilla of evidence that the Sanderses interfered with his interest in his property through intentional, negligent, and abnormal conduct.

### Standard of Review

A directed verdict may be properly granted in one of three instances. First, a directed verdict is proper where there is "no evidence" raised to support a material issue in the suit. *Prudential Insurance Company of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Second, the trial court may direct a verdict where evidence conclusively establishes a fact and "reasonable minds could reach but one conclusion under the available evidence." *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 483 (Tex. 1984). Third, a directed verdict is an appropriate procedural mechanism where a pleading defect renders judgment for the nonmovant on an issue legally impossible. *Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657, 665 (Tex.App.--El Paso 1992, writ denied).

In reviewing a directed verdict, we examine the evidence in the light most favorable to the person suffering an adverse judgment. *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996). The appellate court must review the entire record to determine whether there is more than a scintilla of evidence that a fact question existed. *Field v. AIM Management Group, Inc.*, 845 S.W.2d 469, 472 (Tex.App.--Houston [14th Dist.] 1993), *citing Sterner v. Marathon Oil Co.*, 767 S.W.2d 686,

690 (Tex. 1989). To meet the "more than a scintilla" threshold, evidence must demonstrate more than surmise or suspicion that a fact exists. *Service Corporation International v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).

*Elements of Nuisance and Analysis*

A nuisance is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use or enjoy it. *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003); *Aguilar v. Trujillo*, 162 S.W.3d 839, 850 (Tex.App.--El Paso 2005, pet. denied). A nuisance may arise by causing (1) physical harm to property, such as by the encroachment of a damaging substance or by the property's destruction, (2) physical harm to a person on his property from an assault on his senses or by other personal injury, and (3) emotional harm to a person from the deprivation of the enjoyment of his property through fear, apprehension, or loss of peace of mind. *Aguilar*, 162 S.W.3d at 850. For an actionable nuisance, a defendant must generally engage in one of three kinds of activity: (1) intentional invasion of another's interests; (2) negligent invasion of another's interests; or (3) other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interests. *Id.* at 850-51.

To avoid a directed verdict, Salazar had to present evidence on these elements. *See Cecil v. T.M.E. Investments, Inc.*, 893 S.W.2d 38, 49 (Tex.App.--Corpus Christi 1994, no writ)(stating that the appellant was required to present evidence on each element of her product liability and negligence causes of action in order to avoid a directed verdict). A court of appeals must affirm the trial court's granting of a directed verdict if the appellant fails to present some legally sufficient evidence on each element of the cause of action it raised below. *Cadle Company v. Bankston & Lobingier*, 868 S.W.2d 918, 921 (Tex.App.--Fort Worth 1994), *writ denied*, 893

- 7 -

S.W.2d 949 (Tex. 1994).

The trial court, on its own motion, granted the directed verdict on the private nuisance cause of action. It did so without specifying which elements were not supported by legally sufficient evidence. To prevail on appeal, Salazar must demonstrate that he presented more than a scintilla of evidence on each element of his private nuisance cause of action. Issues One through Three are directed exclusively to whether there is more than a scintilla of evidence that the Sanderses' activity was an intentional, negligent, or abnormal invasion of Salazar's interest. Salazar has failed to raise any issue related to the injury element of this cause of action. Consequently, Salazar has not established he is entitled to reversal. We overrule Issues One through Three.

## INTERFERENCE WITH LATERAL SUPPORT

In Issue Four, Salazar challenges the directed verdict granted on his interference with lateral support claim.

*Relevant Law*

Loss of lateral support is a cause of action recognized in Texas based on a longstanding tradition of English common law. *See Williams v. Thompson*, 152 Tex. 270, 256 S.W.2d 399, 405 (Tex. 1953); *B.A. Mortgage Company v. McCullough*, 590 S.W.2d 955, 957 (Tex.Civ.App.-- Fort Worth 1979, no writ). The Austin Court of Civil Appeals provided an excellent summary of the cause of action in *Simon v. Nance*, 45 Tex.Civ.App. 480, 100 S.W. 1038, 1040 (Tex.Civ.App.--Austin 1907, no writ) which has withstood the test of time so we quote it at length here:

> By the weight of authority it is a well-settled rule of the common law that an owner of land has an absolute right to the lateral support of adjoining land. In other words, he has the right to have his land remain as it was in a state of nature, and neither the adjoining landowner, nor any one else, can rightfully remove from

the boundaries of the land the supports which hold it in its natural position. Therefore, if the adjoining proprietor constructs a ditch or other excavation in such a manner as causes the soil of the complainant to cave in, slough off, or wash away, such adjoining proprietor is liable for damages, and, in a proper case, may be restrained by injunction. The right of lateral support of the soil is absolute, and does not depend upon the question of due care or negligence. However, this absolute right is limited to the soil itself, and does not apply to buildings or other structures which have been placed upon the land. When it is sought to recover damages to improvements which have been placed upon the land, then, as a general rule, the question of negligence becomes an important factor.

A party may not recover for the loss of lateral support unless he shows his land has been injured. *Wingfield v. Bryant*, 614 S.W.2d 643, 645 (Tex.Civ.App.--Austin 1981, writ ref'd n.r.e.) Where there is no injury, there is no need to make the plaintiff whole and a cause of action for loss of lateral support will not lie. *Braxton v. Chin Tuo Chen*, No. 06-10-00134-CV, 2011 WL 4031171 at *6 (Tex.App.--Texarkana 2011, pet. denied)(mem. op.).

*Analysis*

In his fourth amended petition, Salazar alleged that the Sanderses configured the irrigation ditch "so that it fails to provide lateral support to [Salazar's] property." He further alleged that the loss of lateral support caused erosion of his soil, damaged his fence and gates, and prevented him from fencing his property. Thus, Salazar addressed two types of damage: (1) damage to the soil itself in the form of erosion and (2) damage to existing structures. While Salazar was not required to prove negligence with respect to his claim for damage to the soil, he had to offer evidence of negligence to recover for damage to his fence and gates.

Salazar contends on appeal that the trial court incorrectly directed a verdict on the interference with lateral support cause of action based on a purported mischaracterization of law by the Sanderses. According to Salazar, the Sanderses argued in the trial court that there is no cause of action for loss of lateral support unless the land is in its natural state. Citing *Thompson v. Williams*, 249 S.W.2d 238 (Tex.Civ.App.--Fort Worth 1952, no writ) and *Carpentier v. Ellis*,

489 S.W.2d 388 (Tex.Civ.App.--Beaumont 1972, writ ref'd n.r.e), the Sanderses maintained at trial and on appeal that the absolute right to lateral support of the soil from adjoining landowners only applies to land in its natural state and that when a landowner whose land is not in its natural state claims that activities of the adjoining landowner whose land is also not in its natural state have caused damage, the plaintiff must plead and prove negligence by the adjoining landowner. To the extent the Sanderses' argument could be read as urging that there is no cause of action for loss of lateral support unless the land is in its natural state, it is incorrect. However, their argument that a showing of negligence is required to recover for damage to structures is consistent with the law stated in *Simon*. We are not persuaded that any misstatement of the law by the Sanderses caused the trial court to erroneously grant the motion for directed verdict.

We have not reviewed the evidence related to the elements of the loss of lateral support cause of action because Salazar's brief is restricted exclusively to his argument that the Sanderses incorrectly stated the law related to a loss of lateral support claim. It is Salazar's burden on appeal to show that the trial court incorrectly granted the motion for directed verdict, but he has failed to address any of the elements of his loss of lateral support claim. His brief provides no argument nor does it cite to any evidence in the record related to the elements of his loss of lateral support claim for either soil erosion or damage to his improvements. Appellate courts are required to construe briefs reasonably, yet liberally, so that the right to appellate review is not lost by waiver, and in so doing, we should reach the merits of an appeal whenever reasonably possible. *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008); *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997). At the same time, an appellate court should not make the appellant's argument for him because the court would be abandoning its role as a neutral adjudicator and would become an advocate for the appellant. *See Plummer v. Reeves*, 93 S.W.3d

930, 931 (Tex.App.--Amarillo 2003, pet. denied). Thus, when an appellant fails to make a viable complaint supported by citations to authorities and the record, the appellate court is not required to perform an independent review of the record and applicable law to determine whether the claimed error occurred. *See Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex.App.--Houston [1st Dist.] 1995, no pet.). We decline to undertake an independent review of the evidence which might support the elements of his interference with or loss of lateral support cause of action. We overrule Issue Four.

## TEXAS WATER CODE § 11.086

In Issue Five, Salazar challenges the directed verdict on his claim for damages under Section 11.086(b) of the Texas Water Code. *See* TEX.WATER CODE ANN. § 11.086(b)(West 2008). Section 11.086 of the Water Code states, in relevant part:

(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

(b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.

Thus, a plaintiff may collect damages for violation of Section 11.086 when (1) a diversion or impoundment of surface water, (2) causes (3) damage to the property of the plaintiff landowner. *Deitrich v. Goodman*, 123 S.W.3d 413, 417 (Tex.App.--Houston [14th Dist.] 2003, no pet.).

The Sanderses moved for a directed verdict on the ground that Salazar had failed to offer evidence to show that the water which entered onto the Salazar Estate was "surface water" as required by Section 11.086(b).[3] The phrase "surface water" is undefined in the Water Code, but

---

[3] The Sanderses also argued that Section 11.086 did not apply because the irrigation water is not "state water" as required by TEX.WATER CODE ANN. § 11.021. Because we find that the trial court properly granted the motion for directed verdict on the other ground raised by the Sanderses, it is unnecessary to reach the merits of this argument.

it is a term of art when used in the context of riparian rights. *Ehler v. LVDVD*, 319 S.W.3d 817, 825 (Tex.App.--El Paso 2010, no pet.); *Dietrich,* 123 S.W.3d at 417-18. It means water "which is diffused over the ground from falling rains or melting snows, and [it] continues to be such until it reaches some bed or channel in which water is accustomed to flow." *Ehler*, 319 S.W.3d at 825, *quoting Texas Woman's University v. The Methodist Hospital*, 221 S.W.3d 267, 277 (Tex.App.--Houston [1st Dist.] 2006, no pet.); *Dietrich*, 123 S.W.3d at 417. Surface water loses its identity when it becomes a part of a natural watercourse such as a stream or a river, and does not revert to being surface water by virtue of a temporary overflow. *Dalon v. City of DeSoto*, 852 S.W.2d 530, 539-40 (Tex.App.--Dallas 1992, writ denied). Surface water is never found in a natural watercourse having (1) a bank and bed, (2) a current of water, and (3) a permanent source of supply. *Ehler*, 319 S.W.3d at 825; *Texas Woman's University*, 221 S.W.3d at 277; *Dietrich*, 123 S.W.3d at 418. Further, surface waters "do not remain surface waters when these waters enter into a channel that has been touched or modified by the hands of man." *Jefferson County Drainage Dist. No. 6 v. Lower Neches Valley Authority*, 876 S.W.2d 940, 950 (Tex.App.--Beaumont 1994, writ denied).

The water which flows through the Sanderses' irrigation ditch is diverted by EPCWID No. 1 from the Rio Grande River, a natural watercourse, into a man-made irrigation canal and then fed into an appurtenant man-made ditch controlled by floodgate. As such, it is no longer diffused surface water and Section 11.086(b) of the Texas Water Code is inapplicable. The trial court properly granted the directed verdict on this cause of action. Issue Five is overruled.

## TEXAS WATER CODE § 11.088

In Issue Six, Salazar complains that the trial court committed reversible error by refusing to submit an instruction to the jury on his claim based on Section 11.088 of the Texas Water

Code. He states his issue in terms of charge error but also appears to challenge the granting of the directed verdict on this claim. Under TEX.R.CIV.P. 278, a trial court "shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence." Salazar avers that "[i]f an issue is properly pleaded and is supported by some evidence, a litigant is entitled to have controlling questions submitted to the jury." *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *see also Union Pacific Railroad Company v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

While Salazar has correctly stated the standard for submitting an issue to the jury, the trial court resolved the Section 11.088 claim against him by directed verdict. Thus, that claim was eliminated from the pleadings before it even had the chance to go to a jury. If the court's directed verdict was proper, then it had no duty to provide a jury charge. Charge error and a directed verdict error are two separate issues triggered by separate judicial rulings and reviewed under separate standards of review. The challenge to a jury charge does not necessarily raise a challenge to a directed verdict as a proper subsidiary issue under TEX.R.APP.P. 38.1(f). That issue must be raised separately. Rather than finding the issue inadequately briefed, we will construe Issue Six as a challenge to the directed verdict on this claim.

Section 11.088 of the Texas Water Code prohibits several activities which constitute "destruction of waterworks." TEX.WATER CODE ANN. § 11.088. It states that:

> No person may wilfully cut, dig, break down, destroy, or injure or open a gate, bank, embankment, or side of any ditch, canal, reservoir, flume, tunnel or feeder, pump or machinery, building, structure, or other work which is the property of another, or in which another owns an interest, or which is lawfully possessed or being used by another, and which is used for milling, mining, manufacturing, the development of power, domestic purposes, agricultural uses, or stock raising, with intent to:
>
> (1) maliciously injure a person, association, corporation, water improvement or irrigation district;

(2) gain advantage for himself; or

(3) take or steal water or cause water to run out or waste out of the ditch, canal, or reservoir, feeder, or flume for his own advantage or to the injury of a person lawfully entitled to the use of the water or the use or management of the ditch, canal, tunnel, reservoir, feeder, flume, machine, structure, or other irrigation work.

The Sanderses argue that there is no evidence of willful misconduct by them against the property of another because the irrigation ditch belonged to them and was located entirely on their property. We will address the intent elements of the statutory cause of action first.

Sections 11.088(2) and (3) of the Texas Water Code are inapplicable because there is no evidence that the Sanderses changed the irrigation ditch with intent to gain an advantage for themselves, and Salazar does not appear to argue such in his brief. Thus, we must determine whether there is more than a scintilla of evidence that the Sanderses had the intent to maliciously injure Salazar under Section 11.088(1). The Texas Water Code does not define "maliciously" as used in Section 11.088(1). Consequently, we must give the word its ordinary meaning. *See TGS-NOPEC Geophysical Company v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)("Undefined terms in a statute are typically given their ordinary meaning . . . [a]nd if a statute is unambiguous, we adopt the interpretation supported by its plain language."); *cf. Powell v. Stover*, 165 S.W.3d 322, 326 (Tex. 2005)(dictionary may be used to define ordinary meaning of a word).

Malice is commonly understood to be "[t]he intent, without justification or excuse, to commit a wrongful act; . . . [r]eckless disregard of the law or of a person's legal rights; . . . [or] [i]ll will; wickedness of heart." BLACK'S LAW DICTIONARY 968 (7th ed. 1999); *see also id*. at 969 ("malicious, *adj*. 1. Substantially certain to cause injury. 2. Without just cause or excuse."). Thus, there must be some evidence that any injuries resulting from digging of the separation wall stemmed from ill will on the part of the Sanderses toward Salazar or reckless disregard for

Salazar's property interests and not merely from negligence.

We have not found any direct or circumstantial evidence in the record which would permit an inference that the Sanderses dug the separation wall into the ditch for the specific purpose of causing harm to Salazar. Mr. Sanders testified he built the wall in order to seal the ditch and reinforce it to prevent seepage to resolve the dispute between the Sanderses and Salazar. A directed verdict may not be overturned on the basis of mere surmise, suspicion, or a guess. *Service Corporation International v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Issue Six is overruled.

## FACTUAL SUFFICIENCY

In Issue Seven, Salazar challenges the factual sufficiency of the jury's finding that he and the Sanderses entered into an oral contract. In assessing factual sufficiency, we look to whether the challenger of a fact finding had the burden of proof on that issue at trial. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). If the appellant did not have the burden of proof, the issue is framed in the context that there was insufficient evidence to support the finding. *Id.* If the appellant bore the burden of proof, we must determine whether the failure-to-find was against the great weight and preponderance of the evidence. *Id.*

As the proponent of the breach of contract claim, Salazar had the burden of proving that his verbal exchange with Mr. Sanders in 2006 and the subsequent voicemail message constituted an oral contract between Salazar and the Sanderses. We must consider and weigh all of the evidence, and we set aside the jury's finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Ulogo v. Villanueva*, 177 S.W.3d 496, 499 (Tex.App.--Houston [1st Dist.]

2005, no pet.).

A contract is formed when five elements are met: (1) offer; (2) acceptance in strict compliance with terms of offer; (3) meeting of the minds; (4) communication that each party has consented to terms of the agreement; and (5) execution and delivery of the contract with intent that it become mutual and binding on both parties. *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex.App.--El Paso 1993, no writ).

The trial court submitted the following question to the jury:

**Question Three**:

Did Plaintiff Luis M. Salazar and Defendants William Sanders and Patricia Sanders orally agree:

   (a) That they would abide by the Calderon survey; and

   (b) That Plaintiff Luis M. Salazar would fix his side of the line; and,

   (c) That Defendants William Sanders and Patricia Sanders would move the irrigation ditch entirely on their property?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer: __No__

Salazar argues that there was a clear meeting of the minds sufficient to form an oral contract, and points to the voicemail left by Mr. Sanders as conclusive evidence that the Sanderses agreed that the Calderon Line represented the edge of the Sanders Estate and that Salazar would "fix his side of the line." But Salazar is unable to show that the Sanderses promised to move the ditch. He counters that although the Sanderses never explicitly agreed to move the irrigation ditch further inside the Sanders Estate, such an agreement may be implied based on the circumstances. *See Mabon, Ltd. v. Afri-Carib Enterprises, Inc.*, 29 S.W.3d 291, 300 (Tex.App.--Houston [14th Dist.]

2000, no pet.)("the parties may agree upon certain contractual terms and leave other matters" that are not essential terms of the contract open "for later negotiations"). While Salazar is correct that a jury is free to draw all reasonable and logical inferences from circumstantial evidence, the jury may also conversely decline to make those inferences. Given this, we do not find that the jury's conclusion that the Sanderses did not agree to move the ditch is so weak or contrary to the great weight and preponderance of the evidence that it is clearly wrong and unjust. Issue Seven is overruled.

## JURY CHARGE

In Issue Eight, Salazar complains that the trial court committed reversible error by defining the word "intentional" in the jury instructions on trespass as "intending to commit a trespass" rather than "intending to enter land," which impliedly created a "good faith defense" to trespass that does not exist in Texas law. We review charge errors under a two-step process. We must ascertain whether a jury charge error actually occurred. *See Transcontinental Insurance Company v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010). If so, we next assess the level of harm caused by the error and decide if it is sufficiently serious to warrant reversal and remand for a new trial. *See* TEX.R.APP.P.44.1(a)(1); *Transcontinental*, 330 S.W3d at 225 (stating that an appellate court should uphold a judgment unless jury charge error "was harmful because it probably caused the rendition of an improper verdict.").

Trespass to real property occurs when a person enters another's land without consent. *Wilen v. Falkenstein*, 191 S.W.3d 791, 797-98 (Tex.App.--Fort Worth 2006, pet. denied); *General Mills Restaurants, Inc. v. Texas Wings, Inc*., 12 S.W.3d 827, 833 (Tex.App.--Dallas 2000, no pet.). To recover damages for trespass to real property, a plaintiff must prove that: (1) the plaintiff owned or had a lawful right to possess real property; (2) the defendant entered the

plaintiff's land and the entry was physical, intentional, and voluntary; and (3) the defendant's trespass caused injury to the plaintiff's right of possession. *Wilen*, 191 S.W.3d at 798. The only relevant intent is that of the actor to enter the property. *Trinity Universal Insurance Company v. Cowan*, 945 S.W.2d 819, 827 (Tex. 1997). The actor's subjective intent or awareness of the property's ownership is irrelevant. *Id.*

The claimed error is found in Question One which reads as follows:

Did Defendants William Sanders and Patricia Sanders trespass on property owned by Plaintiff Luis M. Salazar?

'Trespass' means a physical, intentional and voluntary entry on the property of another without any right, express or implied invitation, and for the trespasser's own purposes.

'Intentional' means intending to commit a trespass.

'Voluntary' means an affirmative volitional act.

Answer: __No__

An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Union Pacific Railroad Company v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). Salazar argues that the self-referencing nature of the charge does not accurately state the law, but instead suggests that to commit the tort of trespass, a person must first have the intent to enter onto land for a tortious purpose, i.e., to commit trespass. Thus, he maintains the charge is erroneous because trespass may occur even where a person intentionally but inadvertently enters land belonging to another.

Taken as a whole, the self-referencing language sets up a tautology: a trespass is committed when a person physically and voluntarily enters onto land without authorization and while "intending to commit a trespass." The trial court's instruction permitted the jury to find that a person who engaged in an intentional entry onto land did not trespass unless he entered

with intent to trespass. That is not the law in Texas. "[T]he only relevant intent" in a trespass action "is that of the actor to enter the property." *Wilen*, 191 S.W.3d at 798. While an entry onto property that is not volitional may not rise to the level of a trespass, any deliberate entry onto another's land without permission constitutes trespass. *Aguilar v. Trujillo*, 162 S.W.3d 839, 851 (Tex.App.--El Paso 2005, pet. denied). We conclude that Question One is erroneous.

We turn now to a harm analysis. To reverse a judgment based on error in the jury charge, a party must show that the error probably resulted in the rendition of an improper judgment. TEX.R.APP.P. 44.1; *Union Pacific*, 85 S.W.3d at 166. To determine whether error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Development Corporation v. Republic of Texas Savings Association*, 710 S.W.2d 551, 555 (Tex. 1986); *Rhey v. Redic*, 408 S.W.3d 440, 463 (Tex.App.--El Paso 2013, no pet.). Charge error is generally considered harmful if it relates to a contested, critical issue. *Rhey,* 408 S.W.3d at 463, *citing Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).

Salazar does not address harm in terms of Rule 44.1's standard. The jury was required to determine whether Mr. Sanders and the Sanderses' agents physically and voluntarily entered onto Salazar's land. In this context, the jury heard disputed evidence regarding the exact location of the boundary line between the Salazar and Sanders Estates. From this evidence, the jury could find that no physical entry onto the Salazar Estate occurred. The location of the boundary line was the critical issue, not Mr. Sanders' subjective intent. Based on the record before us, we are unable to conclude that the erroneous definition of intentional probably caused the jury to answer this issue in the negative. Issue Eight is overruled.

**ATTORNEY'S FEES**

In Issues Nine through Thirteen, Salazar challenges the award of attorney's fees on multiple grounds. More specifically, in Issue Nine, Salazar argues that the award of attorney's should be vacated because it does not conform to the pleadings. In Issue Ten, he contends that attorney's fees are not available because the Declaratory Judgment Act may not be used to determine potential tort liability. In Issue Eleven, he complains that the DJA may not be used to resolve issues which are already pending in the same suit before the trial court. In Issue Twelve, he asserts that the trial court erred by awarding attorney's fees since the court did not render a declaratory judgment. In Issue Thirteen, Salazar suggests that the court abused its discretion by awarding attorney's fees because the Sanderses failed to segregate the attorney's fees incurred in defending against the declaratory judgment cause of action from the attorney's fees incurred in defending against the other causes of action. The Sanderses respond that a stipulation between the parties at trial bars Salazar from raising any of these complaints about the award of attorney's fees.

A party seeking to recover attorney's fees is ordinarily required to segregate fees incurred on claims allowing recovery of fees from those that do not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006); *Stewart Title Guaranty Company v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997). Segregation is required because trial courts lack the inherent authority to require a losing party to pay the prevailing party's fees, and may only award fees if authorized by contract or statute. *Tony Gullo Motors*, 22 S.W.3d at 311. An exhibit consisting of the billing statements of the Sanderses' attorney (Exhibit D14) was admitted into evidence prior to trial without any objection. Near the conclusion of the defendant's case-in-chief, defense counsel indicated he was going to call himself as a witness on the issue of attorney's fees. The trial court, outside of

the jury's presence, addressed whether attorney's fees were available to the Sanderses. Defense counsel noted that the court had directed a verdict on Salazar's declaratory judgment cause of action and argued that the court had discretion to award the Sanderses reasonable attorney's fees under the Declaratory Judgment Act because they had prevailed on that cause of action. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 37.009 (providing that in any action under the DJA, the court may award costs and reasonable and necessary attorney's fees as are equitable and just). Defense counsel emphasized that the trial court had discretion to award attorney's fees to the Sanderses. The parties then discussed with the trial court whether the issue of attorney's fees would be submitted to the jury along with the breach of contract and trespass claims. After a recess and during the charge conference, counsel and the trial court engaged in the following colloquy regarding a stipulation:

> MR. AINSA [counsel for the Sanderses]: Your Honor, first of all, with respect to the Defendants' attorney's fees, I think we have agreed, and I would like to ask Counsel to stipulate on the record, that attorney's fees will be considered by the Court, not the jury, post judgment. And that the Court has discretion to award attorney's fees to the Defendants without a jury finding if the Court so decides.
>
> THE COURT: Okay.
>
> MR. AINSA: Do you stipulate?
>
> MR. BIEL [counsel for Salazar]: That's correct, Your Honor.
>
> THE COURT: Okay.
>
> MR. BIEL: That is our agreement.

As a result of this stipulation, Ainsa did not present his testimony on attorney's fees before the jury and the court did not submit the issue of attorney's fee issues to the jury. He filed a post-trial application for attorney's fees with the trial court on or about August 23, 2011. That application is supported by counsel's affidavit and detailed billing records. Ainsa faxed a copy

of the application to Salazar's attorney on August 23, 2011. Salazar did not file an objection and the trial court entered the final judgment on August 29, 2011. The judgment recites that: "Plaintiff and Defendant [sic] stipulated that Defendants' legal counsel could submit his application for attorney's fees to the court for consideration. Defendants' counsel submitted an application for attorney's fees supported by his affidavit. The Court finds that the fees charged to Defendants are reasonable and necessary."

At the time the parties entered into the stipulation, Salazar had seen defense counsel's billing statements because they were admitted into evidence prior to trial. Thus, he was fully aware of the nature of the work performed by defense counsel and the amount of the fees already incurred. We agree with the Sanderses that Salazar, by entering into the stipulation, agreed that the trial court had discretion to award attorney's fees to the Sanderses under Section 37.009. Consequently, he is precluded from raising the challenges stated in Issues Nine through Thirteen because each of those issues is based on an assertion that the trial court lacked authority to make such an award. We overrule Issues Nine through Thirteen and affirm the judgment of the trial court.

December 18, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

- 22 -